# United States Court of Appeals
## For the First Circuit

No. 10-1556

UNITED STATES OF AMERICA,

Appellee,

v.

TIEM TRINH,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

Robert A. George, for appellant.
Kirby A. Heller, Attorney, Appellate Section, Criminal
Division, with whom Carmen M. Ortiz, United States Attorney,
Richard L. Hoffman, Assistant United States Attorney, Timothy E.
Moran, Assistant United States Attorney, Lanny A. Breuer, Assistant
Attorney General, and Greg D. Andres, Acting Deputy Assistant
Attorney General, were on brief, for appellee.

December 20, 2011

**TORRUELLA, <u>Circuit Judge</u>.** Defendant-Appellant Tiem Trinh ("Trinh") was convicted after a jury trial for the following charges: conspiring to distribute and possess with intent to distribute 1,000 kilograms or more of marijuana; money laundering; engaging in unlawful monetary transactions; and perjury. He now appeals his convictions on three grounds. First, he claims the district court improperly denied his motion to suppress evidence seized pursuant to a search warrant that he alleges was neither supported by probable cause nor sufficiently particularized, was based on stale information, and led to the allegedly "bad faith" destruction of a marijuana leaf. Second, Trinh argues the district court improperly denied his motion to sever his trial because his defense was irreconcilably inconsistent with those of his co-defendants. Lastly, Trinh contends the district court erred in removing a juror and in denying his motion for a mistrial. Finding no error in the district court's determinations, we affirm.

## I. <u>Background</u>

### A. Joint Operations: A Family Affair

Trinh's two sons, Quoc Boa Trinh ("Quoc") and Tai Trinh ("Tai"), became involved in and managed a large-scale marijuana operation from 2001 until 2007. Quoc and Tai obtained marijuana from various suppliers located in and around Massachusetts. On purchasing the marijuana, the sons sold it in wholesale quantities for further distribution.

Trinh and his wife, Anna Truong Trinh ("Anna"), occasionally assisted Quoc and Tai in operating their drug business. For instance, Trinh sometimes directly participated in the purchase and sale of marijuana, on one occasion buying approximately five pounds of marijuana from an individual and selling it in his convenience store to Daniel DaCosta ("DaCosta") -- a close friend of Quoc and a key cooperating witness for the government at trial -- for $2,000 per pound. On another occasion, Trinh met with a supplier, Chu Mop, for whom Quoc was considering selling marijuana, to discuss the potential business arrangement.

Trinh also helped Quoc and Tai launder their drug sale proceeds.[1] Trinh "washed" the proceeds in a series of complex money transfers -- arranging for the purchase of real estate in both Florida and New York and for the renovation of the family convenience store -- using accounts that were held in different individuals' names.[2]

Perhaps going above and beyond the call of parental duty, Trinh and Anna allowed their sons to store marijuana, drug proceeds, and a money-counting machine in their residence. They

---

[1] One of Trinh's daughters, Stephanie Trinh ("Stephanie"), along with her boyfriend, Le Chau, also helped in the laundering of the operation's drug proceeds.

[2] Evidence at trial established that Trinh performed many of the transactions in the name of one of his daughters, Hoa Trinh, who lived in Alaska and was not involved in any of the subsequent property purchases or use.

-3-

also allowed them to run their business out of the family convenience store. Additionally, to help minimize their sons' reliance on outside suppliers, Trinh and Anna began growing marijuana in their family home in Dorchester, Massachusetts. They also began growing it in a home in Buffalo, New York, purchased for that specific purpose.

To facilitate the Buffalo home growing operations, Trinh and Quoc decided to transfer supplies from the Dorchester home to the house in Buffalo. Supplies included soil that Quoc and his close friend, DaCosta, mixed in Trinh's Dorchester backyard; high-intensity lights, containers, and vitamins that Anna had purchased in Vietnam; and marijuana seeds, obtained from both Quoc and from a visit to Canada. Trinh and Anna began living in the Buffalo house, first renovating it for purposes of plant cultivation, and then growing and raising the plants.

Trinh and Anna's cultivation attempts failed to take root. Although Trinh researched marijuana growing methods -- watching an instructional DVD and consulting two of Quoc's experienced associates -- their attempts at growing marketable marijuana were not successful. In or around early 2007, the Trinhs destroyed the fruits of their efforts, removing any plants that were growing at the time and dumping them on the highway between Buffalo and Dorchester.

**B.  The Investigation: Smoking Out the Details**

Before potting their Buffalo efforts, Trinh and his sons' marijuana operation began to grow increased attention among several law enforcement agencies in or around September 2006.  The Drug Enforcement Administration ("DEA") began conducting surveillance on Trinh and his family while also enlisting the assistance of a confidential source ("CS") who provided detailed reports on the extent and progress of the Trinh operation.  The CS's reports and accompanying surveillance revealed the following information.

The CS recounted to investigating officials that Quoc informed him he "was tired of paying high prices for marijuana" and wanted to obtain a warehouse in Buffalo in which to start his own marijuana "grow operation."  On September 10, 2006, Quoc informed the CS that he and his father, Trinh, were loading up a truck to transport planting materials, lights, and other growing equipment to the home Trinh purchased in Buffalo.  The next morning, at approximately 10:00 a.m., surveillance observed Quoc loading such equipment into a white Dodge van.  At approximately noon, surveillance saw Quoc and two others -- later identified as Trinh and Quoc's brother Antwon -- leaving from Boston, Massachusetts in the van.  Surveillance in Buffalo picked up the van at approximately 7:00 p.m. that evening.  Agents followed it to the Buffalo home's location at 262 Bryant Street and observed as Quoc,

Trinh, and Antwon backed the van up to the garage doors and unloaded the supplies.

On October 17, 2006, the CS provided information indicating that Quoc, Trinh, and Antwon were transporting approximately twelve marijuana plants from Boston to Buffalo in a different white van. Surveillance positioned itself in locations associated with the Trinhs' movements on that evening. Surveillance also intercepted a telephone conversation, in which Quoc stated he was about thirty to forty miles outside of Buffalo, that corroborated the observed movements of the Trinhs. Agents saw the van arrive at the Buffalo home later that evening and observed three males, including Trinh, unload items from the van and into the garage. After unloading the van, the three males entered the house and closed the garage door.

Surveillance saw the CS at the Buffalo house between December 7 and December 9, 2006. The CS provided information regarding his personal observations of the home. Specifically, the CS stated that Trinh and Quoc were growing marijuana plants in both the basement and second floor bedrooms of the house. The CS estimated that there were approximately 200-300 plants growing in the basement. The CS provided information as to the appearance of each room, including, among other details, that the windows and walls in the cultivating rooms were covered in foil; there was a "pit" on the first floor into which Trinh and Quoc would bury their

trash (to prevent it from being mixed into the weekly community trash); a stairway provided access to both the basement and second floor rooms; the basement had aluminum umbrella lights from which a large light bulb hung down, as well as a humidifying system and ventilation system; the second floor rooms had high-powered, umbrella-esque lights with sound-proofing material on the floors and electrical receptacles and wiring in the closets; and one room, containing high-powered lights, was used solely for drying the marijuana buds. The CS also noted the overall layout of the house, including the rooms' specific location in the home and their functional purpose (e.g., dining room, living room, or sleeping area). Lastly, the CS noted that Trinh was staying in the house to oversee the growing operation and that he watered the plants on a daily basis.

On December 18 and 30, 2006, surveilling agents intercepted phone conversations between Trinh and Quoc, providing additional corroboration for the marijuana growing operation. On December 18, Quoc informed Trinh that he had more "fish eggs" for him to incubate; on December 30, Trinh advised Quoc that only two hundred dollars were needed for the "'roses' at his house to be done." Agents believed Trinh and Quoc were communicating in code to refer to, first, the process of growing marijuana seedlings into mature plants, and second, those plants that were almost ready for harvesting and sale.

After several months of investigating the Trinhs, DEA Special Agent Christian Ulmer ("Agent Ulmer"), who had extensive training and experience in the field of marijuana cultivation, applied for a search warrant to search Trinh's Buffalo house for evidence of the marijuana and money laundering operations. Agent Ulmer prepared a seventeen-page affidavit providing information as to the investigation conducted to date. Agent Ulmer noted that some of the information provided in the affidavit came from the CS who "has on numerous occasions provided credible and reliable information which led to the successful seizure of MDMA, marijuana and weapons in the past." The warrant described the property to be seized as that on the "Schedule of Items To Be Seized," which included, among other items, "[p]araphernalia for the packaging, weighing, processing and distributing of marijuana, including scales, plastic bags and utensils."

## C. The Game Is Up: The Trinhs Take the Hit

On January 31, 2007, a magistrate judge authorized the search warrant; agents executed the warrant on February 2, 2007.[3] On entering the Buffalo premises, agents saw no evidence of ongoing marijuana cultivation. Instead, they saw what remained of a dismantled operation. Specifically, agents observed large quantities of planting pots, buckets, and foam cups of different

---

[3] No one was home on the day the agents executed the warrant. Agents left a copy of the warrant at the premises.

sizes, some of which still contained potting soil; venting equipment; boxes of industrial, high-intensity lights; unopened bags of fertilizer; seed starter blocks; and a container filled with "some very goopy, smelly sludge." Agents seized a small sample of the cultivation-based items.

Agents also seized a single leaf, which was believed to have come from a marijuana plant. However, the leaf was subsequently destroyed because, as provided in Agent Eugene DiFiore's February 6, 2007 Report of Investigation, "[t]he approximate one gram of suspected marijuana is well below prosecutorial minimums for both state and federal charges. Per the DEA Agent's Manual, paragraph 6662.52, the suspected marijuana, had no evidentiary value and was destroyed."

Based on this evidence, officers arrested the Trinhs for their alleged involvement in a marijuana growing operation. The Trinhs were charged with conspiring to possess marijuana and possessing marijuana with the intent to distribute it, among other charges.

During the pre-trial stage, Trinh filed a motion to suppress evidence, raising three arguments: (1) the government violated his constitutional rights by destroying potentially exculpatory evidence; (2) the affidavit attached to the search warrant contained stale information and did not provide probable cause for the search; and (3) the warrant was not sufficiently

particularized; stated differently, agents seized "plant-growing chemicals, soil, and planters" that "were not listed in the warrant, making their seizure unlawful."

The district court denied Trinh's motion in a bench ruling. First, the court noted that the defendants "failed to raise an evidentiary issue as to bad faith of the agents," and thus, the court was not going to conduct a hearing on the search warrant affidavit's integrity. Second, the court held that the information in the affidavit was not stale and was sufficient for purposes of establishing probable cause. Third, the court stated that "[t]he breadth of the execution of the warrant is a closer question." Specifically, the court noted that pursuant to the plain view exception,[4] officers may seize evidence and contraband that are "directly inculpatory of a defendant with respect to a particular crime, not innocent materials which could be used in the commission of a crime." Further noting the applicability of the "good faith" doctrine, United States v. Leon, 468 U.S. 897 (1984) (providing for the admissibility of evidence seized during the execution of a search warrant on which officers relied in good faith), and assessing the warrant application under the totality of

_____

[4] The Supreme Court first set forth the plain view exception to the warrant requirement in Arizona v. Hicks, 480 U.S. 321 (1987), permitting the seizure of items -- for which no warrant was specifically issued -- where the officer is lawfully present in the area from which the evidence may be viewed; the officer has lawful access to the items; and the items' incriminating character is "immediately apparent."

the circumstances, see Illinois v. Gates, 462 U.S. 213 (1983), the court determined that the warrant was not executed as "a general warrant," and "[t]here is no reason to believe the officers were acting in anything other than good faith and in good faith seized those matters, those instrumentalities, those things that they seized in this case."

Leaving no leaf unturned, the court lastly held that the agents' destruction of the potential marijuana fragment was not a violation of the defendants' due process rights. The court advised, however, that any testimony concerning the leaf would be limited to "officers who in fact were on the scene, not some after the fact pseudo expert, and that officer may say nothing more than, having given his background and having authenticated [any submitted leaf] photos, that the leaf fragment appeared to be marijuana, or words to that effect."

At trial, the government introduced some of the items seized during the Buffalo search, including planting pots, potting soil, styrofoam cups, a thermostat, a timer, seed starter, fertilizer, plastic baggies, electrical adapters, ballasts, chemicals, light bulbs, and lamp hoods. Additionally, the government introduced photographs that were taken during the seizure showing larger quantities of the previously introduced items. The photographs also showed various equipment generally associated with the indoor cultivation of marijuana. The

government did not introduce evidence concerning the seized and subsequently destroyed marijuana leaf.

The jury convicted Trinh of conspiring to distribute and possess with intent to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. § 846; conspiring to money launder, in violation of 18 U.S.C. § 1956(h); four counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); five counts of engaging in unlawful monetary transactions, in violation of 18 U.S.C. § 1957; and perjury, in violation of 18 U.S.C. § 1621(2). The jury acquitted Trinh of one count of money laundering. Trinh was subsequently sentenced to 144 months of imprisonment, to be followed by five years of supervised release.

Hoping the grass will be greener on appeal, Trinh now challenges his convictions on three grounds: (1) the district court improperly denied his motion to suppress evidence seized during the execution of an allegedly invalid warrant; (2) the district court improperly denied his motion to sever his trial from that of his co-defendants; and (3) the district court erred in removing a juror, thereby prejudicing his trial, and in denying his subsequent motion for a mistrial. We address each claim in turn.

## II. Discussion

### A. The Motion to Suppress

Trinh raises four arguments as to why the district court should have granted his motion to suppress evidence seized during

the search of the Buffalo premises. Trinh alleges, first, that the affidavit failed to show probable cause for the search; second, the information in the affidavit was stale; third, the agents seized items not particularly specified in the warrant; and fourth, agents improperly destroyed a marijuana leaf prior to the defense's examination of it. We address Trinh's arguments seriatim, mindful that our review of a motion to suppress is twofold. That is, on the one hand, "[w]e review de novo the legal conclusions of the district court, 'including the determination that a given set of facts constituted probable cause' . . . [and] the applicability of the Leon good faith exception." United States v. Woodbury, 511 F.3d 93, 96 (1st Cir. 2007) (quoting United States v. Charles, 213 F.3d 10, 18 (1st Cir. 2000)). On the other hand, "[w]e review the district court's fact findings for clear error," United States v. Garza, 435 F.3d 73, 75 (1st Cir. 2006), including the district court's determinations concerning bad faith. See United States v. Gallant, 25 F.3d 36, 39 (1st Cir. 1994). We will affirm a district court's denial of a motion to suppress where "any reasonable view of the evidence supports the decision." Woodbury, 511 F.3d at 97 (quoting Charles, 213 F.3d at 18) (internal quotation mark omitted).

### 1. Probable Cause

Trinh argues that the search warrant affidavit was not supported by probable cause because the affiant largely relied on

the CS, for whom no history of past reliability was established; this is in contrast to other cases in which this Court has deemed an informant to be reliable because he has provided "numerous" tips or helpful information in the past. See, e.g., United States v. Barnes, 492 F.3d 33, 37 (1st Cir. 2007) (finding "ample additional evidence" to support the CS's reliability where the CS had supplied information leading to many past arrests). Further, Trinh submits that any observations resulting from surveillance of the Trinhs corroborated nothing more than innocent acts on the defendants' parts. In particular, Trinh argues that no corroborating evidence confirmed the CS's claims that marijuana cultivation was occurring in the Buffalo residence. We reject Trinh's arguments.

First, it is well-established that "[i]n determining the sufficiency of an affidavit, we consider whether the 'totality of the circumstances' stated in the affidavit demonstrates probable cause to search the premises." United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002) (quoting United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997)). We review the affidavit to make "a practical, common-sense" determination as to whether, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. As the reviewing court on appeal, we accord "considerable deference to reasonable inferences the [issuing judge] may have drawn from the attested

-14-

facts." United States v. Zayas-Díaz, 95 F.3d 105, 111 (1st Cir. 1996) (quoting United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir. 1992) (internal quotation marks omitted); see also United States v. Taylor, 985 F.2d 3, 5 (1st Cir. 1993) ("[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." (alteration in original) (quoting United States v. Caggiano, 899 F.2d 99, 102 (1st Cir. 1990)). Further, in a "doubtful or marginal case," we defer to the issuing judge's probable cause determination. Barnard, 299 F.3d at 93.

Because the affidavit at issue mainly relies on the informing CS's reports to investigating authorities, we apply a "nonexhaustive list of factors" to examine the affidavit's probable cause showing. Id. These factors include, among others, (1) whether the affidavit establishes the probable "'veracity' and 'basis of knowledge' of persons supplying hearsay information," Gates, 462 U.S. at 238; (2) whether an informant's statements reflect firsthand knowledge, Zayas-Díaz, 95 F.3d at 111; see also Gates, 462 U.S. at 234 (providing that an informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case"); Taylor, 985 F.2d at 6 (noting that an affidavit may support an informant's veracity "through the very specificity and detail with which it relates the

-15-

informant's first-hand description of the place to be searched or the items to be seized"); (3) whether "some or all [of] the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance)," Zayas-Díaz, 95 F.3d at 111; and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information, Khounsavanh, 113 F.3d at 284. Because "[n]one of these factors is indispensable," a stronger showing of supporting evidence as to one or more factors may effectively counterbalance a lesser showing as to others. Zayas-Díaz, 95 F.3d at 111.

The affidavit here satisfies these factors. First, contrary to Trinh's claim, the affidavit expressly stated Agent Ulmer's assertion that he deemed the CS to be a trustworthy source because the informant "ha[d] on numerous occasions provided credible and reliable information which led to the successful seizure of MDMA, marijuana and weapons." Because Agent Ulmer supported his statement of the CS's reliability with reference to the latter's history of providing information to authorities, we have at least "some assurance of reliability. Unlike an anonymous tipster, the [CS] [is] known to the police and [can] be held responsible if his assertions prove[] inaccurate or false." Barnard, 299 F.3d at 93; see also Zayas-Díaz, 95 F.3d at 112 (agent's assertion that a CS had "demonstrated his reliability in

-16-

the past" supported the informant's credibility and the veracity of his information); Taylor, 985 F.2d at 5-6.

Second, much of the CS's provided information indicated that he had firsthand knowledge as to the marijuana operation. See United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005) ("A specific, first-hand account of possible criminal activity is a hallmark of a credible tip."). Specifically, the CS provided extensive, detailed information as to what was located in each room of the Buffalo house, including the type and number of light bulbs, humidifier and ventilation systems, and marijuana plants; the location and purpose of the first floor trash "pit;" the types of materials lining the walls and floors of the cultivation rooms; the difference between the items in the growing rooms and the "weed drying" rooms; the location and purpose of electrical receptacles; and the overall geographic layout of the house.

The CS also provided specific information concerning Trinh's activities in the house, including that he was staying there to directly oversee the marijuana growth; that he watered the marijuana plants every day; that he buried all trash related to the marijuana operation in a separate "pit" to prevent its being exposed to the public's view in the weekly trash pile; and that he performed all of the electrical work in the house. The extent and level of detail as to the CS's information concerning the house and growing operation reflects knowledge of hidden, illegal activity,

and not generally obtainable, irrelevant, or non-incriminating facts.  See Barnard, 299 F.3d at 94; Khounsavanh, 113 F.3d at 284. This weighs in favor of the informant's reliability.

Further, the affidavit provided a basis for the CS's firsthand knowledge because it stated that surveillance observed the CS arriving at and entering the Buffalo premises on December 7, 2006; entering and exiting the house with Trinh and Quoc multiple times on December 8; and leaving the house via the right garage doorway on December 9.  Additionally, to be addressed subsequently, surveillance corroborated much of the CS's provided information, further enhancing the reliability of the CS's basis of knowledge as to the marijuana operation.  See Gates, 462 U.S. at 244-45 ("It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" (quoting Jones v. United States, 362 U.S. 257, 269 (1960))).

Third, both surveillance units' monitoring of the Trinhs' movements as well as intercepted phone conversations corroborated much of the CS's information.  Specifically, after the CS informed agents that the Trinhs were loading a truck with growing equipment to transport to Buffalo, surveillance agents saw Quoc and two other men, later identified to be Trinh and Antwon, putting equipment into a van and departing from the Boston area.  Agents stationed in

-18-

the Buffalo area picked up the van when it reached that location and followed it to the Buffalo premises. An intercepted phone call, in which Quoc stated he was approximately thirty miles outside of Buffalo, and surveillance's observations of a white van's arrival at the Buffalo house, additionally corroborated the CS's information that Trinh and his sons were transporting marijuana plants from Boston to Buffalo in a van.

Further corroboration included surveillance's own observations of the Buffalo premises, which matched the CS's firsthand description of the house; intercepted phone conversations between Trinh and his son, in which the men spoke in code about growing marijuana seedlings and harvesting those plants ready for sale, which matched the CS's details of the cultivation activities occurring within the house; and surveillance's observations of the CS entering the premises on December 7, entering and exiting the premises on December 8, and leaving it on December 9, which corroborated the CS's statements that he personally had been to the house during that particular time period.

Although some of this corroborated information might not, at first blush, appear to be indicative of illegal activity, case law makes clear that "corroboration of even innocent activity reported in the tip may support a finding of probable cause," United States v. Perez, 67 F.3d 1371, 1383 (9th Cir. 1995), and that "[c]orroboration of apparently innocent activity can establish

the reliability of the informant because the activity might come to appear suspicious in light of the initial tip." Greenburg, 410 F.3d at 69. Here, the CS provided extensive and detailed descriptions of the Buffalo premises. See Taylor, 985 F.2d at 6 (stating that informant's "detailed description of the premises to be searched, including the exteriors and interiors of the [home], noting in particular the 400 to 500 marijuana seedlings being raised . . . at appellant's residence," weighed in favor of CS's credibility and the issuing judge's probable cause finding).

Furthermore, authorities independently corroborated many of the CS's details through intercepted phone conversations and general monitoring of the Trinhs. See United States v. Soule, 908 F.2d 1032, 1039 (1st Cir. 1990) (noting that police officers' contemporaneous corroboration of the "material elements" of the CS's information "lent substantial intrinsic verification to the informant's veracity and basis of knowledge"). Thus, the fact that surveillance observed seemingly innocent van travels between Boston and Buffalo takes on a greater significance and supports the CS's credibility when viewed in light of other corroborative evidence indicating incriminating activity. See Greenburg, 410 F.3d at 69 (providing that a surveillance agent's "observation of seemingly innocent truck movement, which matched the informant's prediction about such activity, helped establish a substantial reason to

believe that the informant's description of the entire scheme was accurate").

Fourth and finally, Agent Ulmer set forth his particular knowledge and experience in the field of marijuana cultivation operations in the affidavit. He attested that he had been a Special Agent for the DEA for approximately eight years; that he had participated in "numerous" cases involving narcotics distribution; drafted and executed many search and arrest warrants; participated in several Title III investigations; and that he was familiar with, among other processes, the packaging, distribution, and selling of narcotics in drug trafficking organizations. Agent Ulmer also discussed his knowledge, acquired from years of involvement in drug investigations, of indoor marijuana cultivation and propagation operations, providing details that paralleled many of the CS's reports of the Trinhs' actions. It is established that the issuing judge making a probable cause determination "may credit the experience and pertinent expertise of a law enforcement affiant in evaluating the authenticity of the informant's description of the target's modus operandi." Taylor, 985 F.2d at 6. Thus, Agent Ulmer's extensive experience in the field of marijuana cultivation and as a law enforcement officer "plainly buttressed the informant-based indicia of probable cause," id., and "boosted the reliability of the [CS's] information," Barnard, 299 F.3d at 95.

These factors combined to provide the issuing judge with a "fair probability that contraband or evidence of a crime [would] be found" in the Buffalo residence.  Khounsavanh, 113 F.3d at 286 (quoting Gates, 462 U.S. at 238 (internal quotation marks omitted)).  We find no error in the district court's determination that the totality of the circumstances set forth in the affidavit provided a substantial basis for the issuing judge to conclude that probable cause existed.

### 2. Staleness

We similarly find no error in the district court's determination that the information contained in the affidavit was not stale.  Although we agree with Trinh's initial position that "[t]he law sensibly draws no bright-line rule for staleness," Walczyk v. Rio, 496 F.3d 139, 162 (2d Cir. 2007), we must disagree with the heart of his staleness claim, which -- counter to his original proposition -- principally relies on the lapse of time between the informant's detailed observations and the date of the warrant's issuance.  Trinh argues that too much time lapsed between the activities detailed in the affidavit and the issuance of the warrant, thereby reducing the likelihood that evidence supporting a marijuana growing operation would be present in the Buffalo premises at the time of the search and effectively precluding a legitimate finding of probable cause.

Specifically, Trinh argues that the affidavit does not provide any dates after December 9, 2006 when surveillance observed anyone entering or leaving the Buffalo premises. That is, during the near two-month lapse between the early December observations and the January 31, 2007 issuance of the warrant, there is no mention of agents having observed any activity indicative of a marijuana growing operation on the premises. Because no suspicious activity occurred during this two-month period, and further, because nearly five months had passed since agents first observed seemingly suspicious activity, Trinh contends that the information in the affidavit was stale; that the warrant should not have issued; and that the seized evidence should have been suppressed.

In essence, Trinh's argument is one of timeliness. Time, however, is not on Trinh's side.

This Court has repeatedly refused to assess an affidavit's staleness by counting the number of days between the events described in the affidavit and a warrant's issuance, as a merchant would beads on an abacus. See United States v. Morales-Aldahondo, 524 F.3d 115, 119 (1st Cir. 2008) ("When evaluating a claim of staleness, we do not measure the timeliness of information simply by counting the number of days that have elapsed."); United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996) ("[C]ourts confronting suppression motions do not measure the timeliness of collected information mechanistically, merely counting the number

-23-

of days elapsed.").  Instead, we have considered various factors, including "the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information" in assessing the information's ripeness.  Morales-Aldahondo, 524 F.3d at 119.

Here, the underlying facts pointed to an ongoing marijuana cultivation scheme.  The CS told investigating authorities that the Trinhs were involved in a marijuana growing operation, in which the CS had been providing assistance; that the Trinhs were transporting marijuana growing equipment from Boston to Buffalo; and that they were cultivating the marijuana plants in a Buffalo home, of which he provided a detailed description.  Surveillance confirmed the CS's involvement with the Trinhs; observed the Trinhs' equipment movement between Boston and Buffalo; and corroborated the Trinhs' unloading of equipment and residence in the Buffalo house that matched the CS's description.  We have repeatedly recognized that drug operations, when sheltered in the darkness of relative obscurity, often germinate over a protracted period of time; thus, information that might otherwise appear stale may remain fresh and timely during the course of the operation's progression.  See Schaefer, 87 F.3d at 568 (stating "it is common ground that drug conspiracies tend to be ongoing operations, rendering timely information that might, in other contexts, be regarded as stale"); see also United States v. Nocella, 849 F.2d

33, 40 (1st Cir. 1988) (noting that "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time").

Furthermore, the warrant at issue targeted the seizure of materials associated with a marijuana cultivation scheme. Many of these items consisted of hardware and equipment often associated with the growing of marijuana (e.g., special lights and wiring, humidifying and venting systems, and rooms, lined with foil and other padding, to better cultivate the plants), which was likely to be of use to the operation for a considerable period of time. That is, "[t]he warrant did not target items of transient existence," and thus, information that might have tipped the scales towards staleness in other contexts involving more ephemeral or expiring items remained both relevant and timely here. See Schaefer, 87 F.3d at 568; see also United States v. McKeever, 5 F.3d 863, 866 (5th Cir. 1993) (noting the long-term nature of marijuana cultivation; providing that where an affidavit addresses activity of a continuous or extended nature, less current information will be acceptable if the evidence may be reasonably suspected "to be kept for long periods of time in the place to be searched").

Additionally, we note that the requested search in this instance was of Trinh's Buffalo home, which he had purchased and in which he was living, and "not a rented or appropriated facility that could easily be used and then abandoned." Schaefer, 87 F.3d

at 568. The fact that Trinh owned the property and was frequently residing in it (according to both the CS and surveillance units' observations) plays into our staleness assessment, as it indicates the anticipated continual nature of the operation. See id.

Finally, Trinh's assertion that the last relevant date during which surveillance observed activity at the Buffalo residence was December 9, 2006 is incorrect. Agents intercepted two phone conversations laced with marijuana-coded terminology on December 18 and 30, in which Quoc and Trinh discussed the development of marijuana seedlings and the harvesting of already-matured plants. The later discussion occurred approximately one month before the issuance of the warrant, corroborated earlier acquired information, and bridged the gap between the older information and present activities, linking the two together. See id. at 568; see also Nocella, 849 F.2d at 39-40.

These factors thus support the district court's conclusion that the affidavit's information was not stale.

### 3. Particularity

Trinh next argues that the district court improperly denied his motion to dismiss the evidence seized from the Buffalo home because the warrant did not authorize the seizure of "plant-growing materials, such as fertilizer, soil, or planters." Instead, Trinh contends the warrant only authorized the search and seizure of "marijuana plants, currency, paperwork, and even

jewelry, but not plant-growing chemicals . . ., planters, and soil."  For the following reasons, we find no merit to Trinh's argument.

We begin with the basic proposition that the Warrant Clause of the Fourth Amendment prohibits the issuance of a warrant, except one "particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  A search "intruding upon [an individual's] privacy interest . . . must satisfy the particularity requirement, which limits the scope and intensity of the search."  United States v. Mousli, 511 F.3d 7, 12 (1st Cir. 2007) (alteration in original) (quoting United States v. Bonner, 808 F.2d 864, 867 (1st Cir. 1986)) (internal quotation mark omitted).  The significance of the particularity requirement is "not only to circumscribe the discretion of the executing officers but also to inform the person subject to the search and seizure what the officers are entitled to take."  United States v. Roche, 614 F.2d 6, 8 (1st Cir. 1980) (quoting In Re Application of Lafayette Acad., Inc., 610 F.2d 1, 5 (1st Cir. 1979)); see also United States v. Upham, 168 F.3d 532, 535 (1st Cir. 1999) ("The cases on 'particularity' are actually concerned with at least two rather different problems: one is whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take, and the other is whether the category as specified is too broad in the

sense that it includes items that should not be seized." (internal citations omitted)). Where a warrant is accompanied by an affidavit, the "affidavit may be referred to for purposes of providing particularity," provided that "the warrant uses suitable words of reference which incorporate the affidavit." United States v. Klein, 565 F.2d 183, 186 n.3 (1st Cir. 1977).

We turn to the language of the warrant and its supporting documents, which we read "not 'hypertechnically,' but in a 'commonsense' fashion." Barnes, 492 F.3d at 38 (quoting United States v. Gendron, 18 F.3d 955, 966 (1st Cir. 1994)). Included with the warrant was a "Schedule of Items to be Seized," which listed, among other items, the following materials for seizure: "[p]araphernalia for the packaging, weighing, processing and distributing of marijuana, including scales, plastic bags and utensils." Several dictionaries recognize the ordinary, commonsense meaning of "paraphernalia" as "equipment [and] apparatus . . . used in or necessary for a particular activity." United States v. Stiver, 9 F.3d 298, 303 (3d Cir. 1993) (alteration in original) (quoting The Random House Dictionary of the English Language 1408 (2d ed. 1987)); see also Webster's Third New International Dictionary 1638 (2002) (defining "paraphernalia" as "articles of equipment" or "appurtenances"); The Oxford English Dictionary 203 (2d ed. 1989) (defining "paraphernalia" as "articles that compose an apparatus, outfit, or equipment; the mechanical

-28-

accessories of any function or complex scheme"). Further, Agent Ulmer's affidavit, provided with the warrant, made clear that agents trained or experienced in the field of marijuana propagation know that "suspects routinely utilize the following items, and methods" when cultivating marijuana, including planting materials like "potting soil," "fertilizer," or "a root medium," among other items.

Courts have recognized that "officers executing a search warrant are 'required to interpret it,' and they are 'not obliged to interpret it narrowly.'" Stiver, 9 F.3d at 302 (quoting Hessel v. O'Hearn, 977 F.2d 299, 302 (7th Cir. 1992)). Here, the officers who executed the warrant already had sufficient cause to believe the Buffalo premises were being used towards the operation of a marijuana cultivating scheme; the officers therefore had a reasonable basis for determining that the plant-growing chemicals, planters, fertilizer, and soil constituted "equipment" or "apparatus" that was a necessary element to the marijuana growing operation, and they properly seized the plant-growing materials.[5]

---

[5]  We note that even if it could plausibly be argued that the warrant in this instance lacked particularity, the district court's denial of Trinh's motion to suppress still would have been proper because the seized items would have been admissible under either (1) the plain view doctrine or (2) Leon's good-faith exception.

Pursuant to the plain view doctrine, agents may seize items in plain view if "the seizing officer has a prior justification for being in a position to see the item in plain view," United States v. Owens, 167 F.3d 739, 746 (1st Cir. 1999), and he has probable cause to believe the items are of an incriminatory nature. See

Thus, we affirm the district court's conclusion that suppression was not warranted on particularity grounds.

### 4. Destruction of the Leaf

We proceed to Trinh's final argument in support of his motion to suppress. Trinh contends that a leaf seized at the Buffalo home -- which the government alleges was a marijuana leaf -- was improperly destroyed before either the government or Trinh had an opportunity to inspect, examine, or test it. Because "the

United States v. Hamie, 165 F.3d 80, 82-83 (1st Cir. 1999). Here, the plant-growing materials were seized during the execution of a search warrant that specifically targeted items relating to a marijuana growing operation; further, the incriminatory nature of the items was "immediately apparent" to the officers. See United States v. O'Campo, 381 F. App'x 974, 975 (11th Cir. 2010) (seizure of items proper because, "[a]lthough these items could be used for legitimate purposes," they also could be associated with a marijuana growing operation and thus "were incriminating on their face because, before entering the house, executing officers had probable cause to believe that the house contained a marijuana growing operation").

Under the good-faith exception to the exclusionary rule, improperly seized items may still be admissible where it is shown that the officers, acting in objective good faith, "obtained a search warrant from a judge or magistrate and acted within its scope," Leon, 468 U.S. at 920. The facts here show that the officers obtained a warrant that authorized them to seize various items associated with a marijuana growing operation, including "paraphernalia for the . . . processing . . . of marijuana." The warrant was accompanied by an affidavit, which described in detail the various components of a marijuana cultivation scheme, many of which consisted of items that were strongly similar to those actually seized during the search.

For these reasons, the district court did not err in concluding that the officers acted in good faith when they seized items akin to those expressly authorized by the warrant, and that the seized items were of an "immediately apparent" incriminating nature, further supporting their admissibility.

exculpatory value of the alleged marijuana was apparent before its destruction," Trinh submits that the police acted in bad faith when they intentionally destroyed untested evidence almost immediately following its seizure.  For these reasons, Trinh argues the government "should not have been allowed to present testimony at trial about finding evidence of marijuana," and that "[t]he denial of [his] motion [to suppress] and the introduction of such evidence was error."  We reject Trinh's arguments.

The record clearly shows that no evidence concerning the leaf fragment was in fact introduced at trial, making any argument in favor of his motion to suppress (in contrast to Trinh's other arguments) now moot.[6]  See United States v. Ricciardelli, 998 F.2d 8, 15 n.7 (1st Cir. 1993) (addressing issue of appellant's consent as to seized items on review of lower court's denial of a motion to

---

[6]  Although Trinh's only action against the destruction of the leaf was a motion to suppress, we note Trinh's argument that the police's withholding of allegedly material exculpatory evidence constituted a potential due process violation.  A failure to preserve potentially useful evidence does not constitute a due process violation unless Trinh can show the police agents' bad faith. Arizona v. Youngblood, 488 U.S. 51, 57 (1988) (noting that when "deal[ing] with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," the Due Process Clause requires a showing of bad faith on the part of the police).  Here, Trinh has neither presented facts contradicting the government's explanation that the leaf fragment was destroyed in accordance with DEA routine procedure, nor has Trinh countered the government's position that it initially identified the leaf fragment to be marijuana before its destruction, weighing against a conclusion that agents intentionally destroyed potentially exculpatory evidence.

suppress and stating, "[t]he short, conclusive answer in regard to such items is that the government did not seek to use them against appellant or introduce them into evidence at the trial. Any controversy [regarding] such items is, therefore, moot"); United States v. Veillette, 778 F.2d 899, 904 n.4 (1st Cir. 1985) ("The district court correctly limited its consideration to items which the government intended to introduce at trial. The suppression issue was moot as to items in which the government had no interest as evidence.").

For these reasons, we conclude that the district court's determination that the agents did not destroy the leaf fragment in bad faith was not clear error.

## B.  The Motion to Sever

Trinh next argues that the district court erred in denying his motion for severance because his defense was irreconcilably inconsistent with those of his co-defendants. In particular, Trinh contends that admitted statements from co-conspirators were "terribly prejudicial" to his defense, "were being recounted by witnesses in a totem pole fashion," and "came from conversations with Quoc and others, not with Tiem himself," thus prejudicially impacting his involvement in the conspiracy.

We review a district court's denial of a motion for severance under Fed. R. Crim. P. 14 "for any manifest abuse of discretion which deprived appellant of a fair trial and resulted in

a miscarriage of justice." United States v. Celestin, 612 F.3d 14, 19 (1st Cir. 2010) (quoting United States v. Peña-Lora, 225 F.3d 17, 33 (1st Cir. 2000) (internal quotation marks omitted)). We note that "[t]he hurdle is intentionally high," Peña-Lora, 225 F.3d at 33 (quoting United States v. Flores-Rivera, 56 F.3d 319, 325 (1st Cir. 1995)) (internal quotation mark omitted), most notably in conspiracy cases where severance "is especially disfavored," id., because joint trials "promote efficiency," Zafiro v. United States, 506 U.S. 534, 537 (1993), and help to avoid "inconsistent verdicts," id. (quoting Richardson v. Marsh, 481 U.S. 200, 210 (1987)). Rather, severance will be warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Celestin, 612 F.3d at 19 (quoting Zafiro, 506 U.S. at 539).

The record shows that Trinh first moved to sever his trial from his co-defendants on the second day of trial, asserting that co-defendants' counsel's opening statements were antagonistic to his defense because they wrongfully characterized him as the "mastermind" of both the marijuana and money laundering schemes; in contrast, Trinh's position was that Quoc and Tai were the actual leaders of the conspiracy. Trinh then renewed his motion to sever

at various times during trial which, following careful consideration, the trial judge denied.[7]

A review of the record reveals no manifest abuse of discretion by the district court in its denial of Trinh's motion to sever. Trinh's severance claim is that the court improperly denied his motion because his defense was irreconcilable with those of his co-defendants; Trinh bears the burden on appeal of "establish[ing] that any incompatibility was very substantial." Peña-Lora, 225 F.3d at 34. Furthermore, "[t]o obtain severance on the grounds of conflicting defenses, a defendant has to demonstrate that the defenses are so irreconcilable as to involve fundamental disagreement over core and basic facts." United States v. Paradis, 802 F.2d 553, 561 (1st Cir. 1986)(emphasis added); United States v. Luciano-Pacheco, 794 F.2d 7, 9 (1st Cir. 1986) ("[T]he need for severance turns on the degree of conflict, and the extent to which the antagonism goes beyond mere fingerpointing into the realm of fundamental disagreement over core and basic facts."). Trinh falls far short of satisfying his substantial burden.

_____

[7] Specifically, Trinh renewed his motion twice during Le Chau's direct testimony -- in which Le Chau stated his girlfriend (and Trinh's daughter) Stephanie asked him to purchase blank checks for her family's purchase of a home in Buffalo, that he gave the checks to Trinh, and that he at times loaned Trinh money, who later paid him back --; once following Antwon's outburst that a witness's testimony was "a total lie"; and once upon the court's ruling that Stephanie's counsel could cross-examine DaCosta as to favors Le Chau did for Quoc.

-34-

To begin with, the only specific evidence Trinh points to in support of his irreconcilable defenses claim is his co-defendants' counsel's opening statement, during which Trinh contends he was portrayed as the mastermind of the marijuana and money laundering schemes. Such argumentation by counsel rarely is sufficient for establishing a "truly prejudicial antagonistic defense." Peña-Lora, 225 F.3d at 34 n.14 (noting that "[e]ach case [involving alleged irreconcilable defenses] must be assessed on its own facts"); United States v. Rose, 104 F.3d 1408, 1416 (1st Cir. 1997) ("[T]he level of antagonism in defenses is measured by the evidence actually introduced at trial; argument by counsel is not evidence.").

Furthermore, much of co-defendants' admitted evidence and testimony at trial did not conflict with Trinh's defense that he was a law-abiding businessman who engaged in "legitimate" real estate transactions. For instance, co-defendants' counsel presented evidence -- including testimony from government witness DaCosta describing Trinh's legitimate business activities and testimony from an IRS summary witness affirming Trinh's valid sources of income -- that, far from substantially conflicting with Trinh's defense, served to further reinforce it by highlighting the legitimate nature of certain financial transactions in which he was involved.

-35-

Additionally, an examination of Trinh's co-defendants' defenses weighs against a finding of irreconcilability. For instance, Anna's defense -- that she was unaware of any marijuana growing operation, did not participate in any drug transactions, and signed financial documents with no knowledge as to their significance -- did not conflict with Trinh's position that he did not play any role in his sons' drug deals or knowingly launder any drug proceeds. Likewise, Antwon's defense did not reference his father at all; instead, he asserted there was no credible evidence of a drug operation and that the cooperating witnesses were lying.

In essence, Trinh's irreconcilability argument amounts to nothing more than an attempt to shift the blame onto his co-defendants. However, our precedent makes clear that "mere fingerpointing among codefendants -- i.e., the familiar 'he did it, not I' defense -- normally is not a sufficient ground for severance." Peña-Lora, 225 F.3d at 33; see also Zafiro, 506 U.S. at 538 (refusing to adopt a "bright-line rule, mandating severance whenever codefendants have conflicting defenses"); United States v. McLaughlin, 957 F.2d 12, 18 (1st Cir. 1992) ("The fact that two defendants assert antagonistic defenses does not, per se, require severance, even if defendants are hostile or attempt to cast blame on each other.").

Not only does Trinh fail to establish a sufficient degree of antagonistic conflict between the defenses, but he also does not

show any prejudice arising from the joint trial. United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990) ("When severance has been refused, the burden is on appellants 'to make a strong showing of prejudice' in order to gain a new trial." (quoting United States v. Porter, 764 F.2d 1, 12 (1st Cir. 1985))). To establish prejudice, Trinh must show "more than just a better chance of acquittal at a separate trial. Garden variety prejudice, which always exists when more than one defendant or offense are tried together, does not warrant a new trial." United States v. Tejeda, 481 F.3d 44, 55 (1st Cir. 2007)(citation and internal quotation marks omitted).

First, the majority of the evidence presented was admissible against both Trinh and his co-defendants, whether they were tried jointly or independently; this weighs against a finding of prejudice in the denial of a severance motion.[8] See United

---

[8] Indeed, the evidence to which Trinh points to establish prejudice does not advance his severance argument. Specifically, Trinh identifies statements by alleged co-conspirators to missing co-defendants, which he asserts were described "in a totem pole fashion;" and testimony from cooperating witnesses regarding their conversations with Quoc about Trinh. Such evidence, consisting of co-conspirator statements (admissible pursuant to Fed. R. Evid. 801) and witnesses' observations rationally based on personal perceptions (admissible pursuant to Fed. R. Evid. 402), would have been admissible against Trinh regardless of whether he was tried jointly or independently, and does not cut in favor of a finding of prejudice.

Trinh also submits that the court's dismissal of a juror near the end of trial led to "closed-door haggling over who [of the co-defendants] would go free at the cost of another." However, at the time the district court denied Trinh's motion to sever, the juror incident had not yet taken place; an event not yet in play can hardly be factored into an assessment of whether the court abused

States v. DeCologero, 530 F.3d 36, 54 (1st Cir. 2008) (finding severance not warranted on grounds of evidentiary spillover effects because "even if the defendants had received separate trials, [the] evidence [at issue] would have been independently admissible against each"); United States v. Richardson, 515 F.3d 74, 82 (1st Cir. 2008) (noting that when evidentiary "spillover serves as the ground for a defendant's severance motion, this Court has repeatedly refused to overrule a denial of severance if substantially the same evidence would have been admitted in separate trials"); United States v. DeLuca, 137 F.3d 24, 36 (1st Cir. 1998) (stating that "any evidentiary spillover is vitiated where the evidence in all events would have been admissible against the movant").

Second, the record shows that the district court judge repeatedly advised the jury of its obligation to consider the evidence against each defendant individually and not to allow any familial connections amongst the defendants to affect its determination of whether the defendants were co-conspirators. See Boylan, 898 F.2d at 246 (finding no abuse of the district court's Rule 14 discretion where the judge issued "limiting instructions as to the admissibility of evidence against particular defendants and as to the need to determine guilt on an individual basis"); see also United States v. Soto-Beníquez, 356 F.3d 1, 30 (1st Cir. 2004)

its discretion when evaluating Trinh's severance motion.

-38-

(upholding district court's denial of motion to sever where, among other factors, the court instructed the jury of its obligation to judge each defendant separately, considering only the evidence admissible against each respective defendant); United States v. Capelton, 350 F.3d 231, 239 (1st Cir. 2003) (same).

Further, an examination of the jury's verdict shows that the jury heeded the court's instructions, effectively considering the evidence and weighing it against each defendant separately. Boylan, 898 F.2d at 246 (upholding the district court's denial of defendants' Rule 14 motion because "[t]he discriminating verdict . . . evidenced that the jurors were able to, and did, follow the court's [limiting] instructions," weighing against a finding of prejudice); see also DeCologero, 530 F.3d at 56 (evaluating risk of prejudice underlying appellant's severance motion, and noting that the jury "tellingly" returned "highly individualized verdicts," acquitting some defendants while convicting others, which showed that "[t]hese were not the verdicts of a jury confused about the identity and culpability of the individual defendants"); United States v. Houle, 237 F.3d 71, 76 (1st Cir. 2001) (stating that, "[w]ith regard to the jury's ability to segregate the evidence and understand the judge's instructions, the verdict itself is often quite telling;" and noting the verdict in that case "show[ed] that the jury was able to compartmentalize evidence and apply it to each defendant," weighing against a

finding of prejudice warranting severance). For instance, the jury acquitted Trinh on one of the money laundering counts; acquitted Antwon in full; acquitted Anna on the substantive unlawful monetary transaction count while convicting her on the two conspiracy counts; and acquitted Stephanie on the substantive counts without reaching a determination as to the money laundering conspiracy count.

Moreover, any allegation that Trinh's joint trial led to a prejudicial evidentiary spillover that caused the jury to view him, rather than the other defendants, as a mastermind of the underlying conspiracies is essentially negated by a review of the jury verdict form. The form shows that the jury expressly found that Trinh was neither "an organizer or leader of a money laundering conspiracy that involved five or more participants or was otherwise extensive," nor "a manager or supervisor . . . of criminal activity involving five or more participants or was otherwise extensive."

Additionally, the form shows that the jury made differentiated determinations as to the money laundering amounts and number of marijuana plants attributable to Trinh, reflecting their findings as to Trinh's role within the alleged conspiracies. Specifically, although the jury concluded that the marijuana conspiracy consisted of approximately 70 plants and 1,000 kilograms or more, it found that only six plants could be ascribable to

Trinh; while it concluded that the money laundering conspiracy involved $1,500,000, it found that only $200,000 could be imputable to Trinh. Because a review of the record reflects no prejudice arising from the joint trial of Trinh and his co-defendants, we accordingly hold that the district court did not abuse its discretion in denying Trinh's motion to sever. See DeCologero, 530 F.3d at 54 (noting that "'[i]n the context of conspiracy, severance will rarely, if ever, be required' due to evidentiary spillover." (quoting DeLuca, 137 F.3d at 36)).

## C. Removal of Juror and Denial of Motion for a Mistrial

Trinh's final argument is that the district court (1) abused its discretion when it removed a juror (Juror A) based on reports that he had been observed by fellow jurors meeting with Trinh and Stephanie outside of the courtroom, and (2) erred when it denied Trinh's subsequent motion for a mistrial based on the juror's removal. Before addressing the merits of Trinh's argument, we review the facts relevant to this particular issue.

### 1. Factual Background

Prior to the close of evidence, the jury foreperson reported to the court that one of the jurors had been seen talking with Trinh and Stephanie. On being notified, the trial judge immediately held a sidebar conference and informed the lawyers that he intended to take a representative from each side, interview the foreperson in the representatives' presence, determine whether the

-41-

foreperson "is the source of the information or whether it's another juror," and if another juror or jurors were the source, to inquire of them what they in fact observed. If, upon such investigation, the judge concluded that the juror at issue should be removed, he would excuse him; he then would interview the remaining jurors and determine whether they believed they could fairly adjudicate the case.

The record shows that the judge abided by his proposed procedure, consulted with counsel during voir dire, and gave counsel the opportunity to propose different topics for questioning during the voir dire examination. See United States v. Hunnewell, 891 F.2d 955, 961 (1st Cir. 1989). Two jurors stated they witnessed Juror A speaking with Trinh while the latter was holding an open manila folder, with one juror (the foreperson) estimating the interaction lasted approximately three minutes, and with the other (Juror B) estimating approximately ten to fifteen seconds. A third juror said, in a separate incident, she had seen Stephanie walk up to Juror A while he was walking and speak to him. The juror stated, "[i]t wasn't just hello and walk on. They walked about an eighth of a mile together and then they split off," appearing to "just [be] chitchatting."

-42-

Voir dire revealed that the witnessing jurors had conversed amongst themselves and with several others[9] concerning their observations of Juror A; one juror stated she had discussed the matter on more than one occasion. The record is less clear on the issue of the manila envelope. Whereas the foreperson and Juror B stated they simply recalled seeing Trinh holding it while speaking with Juror A, another juror said he recalled the foreperson stating he had seen Juror A "pass[] an envelope to Mr. Trinh and talking with him." The juror later clarified that "maybe I'm misspeaking saying passing," but he did recall the foreperson mentioning the presence of a manila envelope during the encounter.

Finally, the voir dire record shows that the trial judge specifically asked each of the questioned jurors whether their knowledge as to Juror A's interactions with Trinh and Stephanie would or had affected their respective ability to be open-minded, fair, and impartial; each juror assertively replied in the negative. The trial judge also advised each questioned juror against discussing their interview or its substance with the other jurors.

Trinh moved for a mistrial upon the conclusion of the court's voir dire. Of particular concern to Trinh was the fact that one of the jurors "believe[d] he heard someone say that [Juror

---

[9] It was not clear from the record if "others" included other jurors or simply other individuals who were present at the time of the discussions.

A] was either being passed an envelope or was passing an envelope," as he feared this could lead to the improper inference that Trinh was engaging in a bribe or other form of corruption. Trinh also emphasized his concern that if the court dismissed Juror A, the effective upshot would be a belief amongst the other jurors that Juror A had been dismissed for wrongdoing and/or negative attention towards Trinh just prior to jury deliberations.

After hearing from all parties, the court decided to remove Juror A and took Trinh's motion for mistrial under advisement. It proceeded to voir dire the remaining jurors, all of whom were generally asked only whether they had "observed any interaction, between any juror and anybody involved in the case, the lawyers, the witnesses, the people accused, anything at all," without mentioning, revealing, or providing any details as to the alleged underlying interactions; no juror witnessed or had any knowledge as to any such interactions, and each asserted he could be fair and impartial. The judge asked all of the jurors -- including those previously voir dired -- as to their reactions to Juror A's removal;[10] all confirmed that their impartiality remained unaffected.

---

[10] The court clerk reported to the judge that when Juror A entered the jury room following his dismissal, "he blurted out, 'I've been kicked off the jury.'" The judge also asked jurors as to their reactions to Juror A's outburst on being removed. Some had not noticed the outburst; others had indifferent reactions.

Returning to trial, the court instructed the jury as follows:

> This morning we went through a procedure and we have one less juror. I want to say to you in as strong as possible terms that has nothing to do with the substance of this case. It is not to bear upon your deliberations about the substance of this case in any way.

It later denied Trinh's motion for a mistrial, stating that "the thorough inquiry that the Court engaged in, its strong instructions to the jury, and the evidence that the Court had before it, do not in this instance warrant a mistrial." And again, in administering its final instructions to the jury before its deliberations, the court advised that "[t]he interviews yesterday morning, the individual interviews, and the questions I asked you, none of that has anything to do with this case," and reminded jurors of their obligation to "judge this case fairly and impartially on this evidence."

### 2. Analysis

We review a district court's removal of a juror for abuse of discretion. Williams v. Drake, 146 F.3d 44, 50 (1st Cir. 1998); see also United States v. Lemmerer, 277 F.3d 579, 591-92 (1st Cir. 2002). We likewise review a district court's denial of a motion for mistrial on the grounds of juror misconduct for an abuse of discretion. United States v. Cruz, 156 F.3d 22, 28 (1st Cir. 1998). We apply a clear error analysis to our review of the

court's factual findings. United States v. Ortiz-Arrigoitía, 996 F.2d 436, 443 (1st Cir. 1993).

It is well-established that "[w]here a colorable claim of jury taint surfaces before jury deliberations occur, . . . [t]he judge should investigate the allegation promptly, addressing whether the taint-producing event occurred, and if so, assessing the magnitude and extent of any prejudice caused." Tejeda, 481 F.3d at 52; see also United States v. Barone, 114 F.3d 1284, 1307 (1st Cir. 1997) (quoting Ortiz-Arrigoitía, 996 F.2d at 442) ("When a non-frivolous suggestion is made that a jury may be biased or tainted by some incident, the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial."). If, upon its investigation, the court concludes that the alleged taint-producing event in fact occurred and that it carries with it a risk of prejudice, the court then must assess what, if any, remedial measures might serve to remove the prejudice, and if none, consider the possibility of a mistrial. See Tejeda, 481 F.3d at 52.

The facts here show that the district court abided by this procedure, and Trinh does not contend -- and in light of the record, nor could he reasonably do so -- that the court's investigation as to juror misconduct was insufficient.[11]  See

---

[11]  Indeed, it is clear that the district court acted within its broad discretion when it decided to remove Juror A.  Its investigation confirmed that several jurors had observed Juror A

<u>Hunnewell</u>, 891 F.2d at 961 (finding court's investigation into alleged juror misconduct to be "textbook model" where court conducted voir dire, consulted counsel and allowed them to participate in questioning process, and carefully considered jurors' respective answers as to whether they had seen the misconduct and/or believed their ability to remain impartial had been compromised). We thus limit our analysis to Trinh's contention that the court's dismissal of Juror A created an improper inference amongst the jury that Juror A was removed for wrongdoing that members inevitably would associate with Trinh. We find no merit to this argument.

---

having separate communications with two defendants. One such communication was described by the witnessing juror as "[not] just hello and walk on," but rather, as a communication while Juror A and Stephanie walked for "about an eighth of a mile;" additionally, at least two jurors observed Juror A interacting with Trinh while the latter was holding (or possibly opening) a manila folder. Such instances were sufficient to raise, at the very least, a questioning eyebrow, if not a red flag altogether, as to the proper nature of such juror-defendant interactions. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Vartanian</u>, 476 F.3d 1095, 1096-97 (9th Cir. 2007) (finding no abuse of discretion in district court's removal of juror whom other jurors had observed speaking with defendant, defendant's family, and defense counsel); <u>United States</u> v. <u>Ford</u>, 184 F.3d 566, 588 (6th Cir. 1999) (upholding district court's removal of juror where it was alleged that a defendant in a multi-defendant case had contacted the juror during trial; also upholding court's denial of defendant's motion for severance and mistrial where court sufficiently investigated alleged misconduct, examined the remaining jurors, and confirmed that none had been tainted by the alleged misconduct); <u>United States</u> v. <u>Thornton</u>, 1 F.3d 149, 154 (3d Cir. 1993) (finding no abuse of discretion where district court removed a juror who had been observed by a United States marshal engaging in non-verbal, visual communications, like smiles and head nods, with the defendant).

Of the jurors who witnessed or learned of some form of interaction between Juror A and Trinh or Stephanie, all expressly stated that their ability to be impartial remained untarnished, and none expressed any concern or bias arising from the alleged incidents of misconduct. The court's questioning of the remaining, non-witnessing jurors similarly confirmed that none felt as though their ability to remain fair and impartial had been affected by Juror A's removal. Additionally, the court's questioning of the jury following Juror A's removal confirmed that the jurors did not attribute the removal to the defense; instead, they viewed Juror A alone as the sole cause of removal.[12]

Third, during voir dire, the trial judge specifically and carefully instructed each juror not to talk about the underlying alleged misconduct or the substance of the judge's questioning. On returning to trial, the court advised the jury that Juror A's removal "has nothing to do with the substance of the case," was

---

[12] During voir dire, several jurors volunteered their beliefs that Juror A had been removed for such reasons as his unusual behavior, personal commitments, or health issues. For instance, one juror stated that Juror A told a "bunch of other stories" that made the juror question "whether [Juror A] can be open-minded or not;" another described conversations he had with Juror A in which he seemed "delusional" and "strange;" a third juror surmised that the court had removed Juror A because he must have "said something that may have made him seem prejudicial about either the defendants or the process;" a fourth guessed that, because the trial had gone on longer than initially anticipated, Juror A had a prior engagement to which he had to dedicate himself; a fifth believed that Juror A might have had a health issue that required attention; and another suggested that Juror A's removal had "nothing to do with the case or anything, it's just his personal thing."

"not to bear upon your deliberations," and reminded members "not to discuss the substance of this case with anyone." The judge's removal of Juror A, along with the court's curative measures of issuing repeated instructions to the jury concerning the alleged misconduct and the juror's removal, ameliorate any concerns of prejudice in this case. See United States v. Sepúlveda, 15 F.3d 1161, 1195 (1st Cir. 1993) (finding that district court appropriately refused to declare a mistrial where the judge already had "removed the offending juror from the case and issued hortatory instructions to the remaining jurors"); see also Tejeda, 481 F.3d at 53-54 (finding no abuse of discretion when district court declined to declare a mistrial after removing a potentially threatening spectator where it had instructed and "observed the demeanor" of each juror as to impartiality). Moreover, Trinh's underlying claim that Juror A's removal in effect prejudiced the jury against him is inherently weakened by the fact that the jury acquitted Trinh of money laundering, and also, acquitted Stephanie -- who allegedly had approached Juror A while he was walking and engaged in a longer-than-a-simple-greeting conversation.

## III. <u>Conclusion</u>

For the foregoing reasons, we find no error in the district court's rulings, and we affirm Trinh's conviction.

**<u>Affirmed</u>**.