# United States Court of Appeals
## For the First Circuit

No. 02-2484

UNITED STATES OF AMERICA,

Appellee,

v.

VICTOR PAGAN-ORTEGA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

Juan P. Rivera-Román, by Appointment of the Court, for appellant.
Daniel J. Vaccaro, Assistant United States Attorney, with whom H.S. Garcia, United States Attorney, Sonia I. Torres-Pabón, Assistant United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, were on brief for appellee.

June 9, 2004

**COFFIN, Senior Circuit Judge**.  This is an appeal from a judgment following a conditional plea of guilty to one count charging possession with intent to distribute more than 50 grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1), and one count of possession, during and in relation to drug trafficking, of a firearm in furtherance of such drug trafficking, in violation of 18 U.S.C. § 924(c)(1).  Appellant raises two issues:  improper judicial participation in the plea negotiations and an erroneous refusal to permit appellant to withdraw a plea of guilty that appellant asserts was both uninformed and involuntary.  We conclude that there was no plain error as to the first issue and, as to the second, no abuse of discretion in concluding that appellant had not sustained his burden of establishing a fair and just reason for withdrawal of his plea.

## I.  The Facts

The essential facts as proffered by the government and accepted by appellant are that after considerable surveillance, and under authority of a warrant, the residence of appellant was searched and yielded approximately 1,200 capsules of crack cocaine, 1,168 grams of crack cocaine, plus a considerable quantity of cocaine rock, heroin, marijuana, nearly $2,000 in currency, and a loaded, .40-caliber Beretta pistol.  A laboratory test ascertained that a total of 95.8 grams of cocaine base were seized.

The indictment issued on May 30, 2001. On July 10, 2001, a status conference was held. On July 31, appellant's then attorney wrote to the prosecution, inquiring what the government's position would be as to any plea agreement. On August 7, the government responded, noting first that if appellant were convicted following jury trial, the 95.8 grams of cocaine base would result in a Base Offense Level (BOL) of 32, yielding a range of 121-151 months' imprisonment under the Sentencing Guidelines, and that conviction on the firearms count would require an additional 60 months, for a total of 15 to 17-1/2 years. The government offered to stipulate that appellant be held responsible for an amount between four and five grams of cocaine base, and to recommend a reduction of three levels for acceptance of responsibility, yielding a Guidelines range of 37-46 months' imprisonment. The government would recommend 46 months on one of two drug counts and, on the firearms count, the mandatory 60 months, for a total 106 months or 8-1/2 years. It would dismiss the second drug count.

On August 14, appellant's attorney replied, pointing out that the weapon and the drugs were found in different locations, and that this was not "typical" weapon-drug trafficking activity. On August 15, the day before the date set for a change of plea hearing, appellant's attorney attempted unsuccessfully to see appellant at the Metropolitan Detention Center. Upon finding that appellant had been transported to court, the attorney returned to

court only to find that by this time, appellant had been taken back to the Center.

On the next day, August 16, 2001, the district court held the change of plea hearing. Immediately prior to the hearing, appellant finally had a chance to discuss the plea agreement with his attorney. Although the attorney told appellant that he was willing to go to trial if appellant so desired, appellant determined that he would accept the plea agreement. The court was thus informed at the start of the hearing that, although not yet reduced to writing, a plea agreement had been reached. The court questioned both the government and appellant's counsel, confirming that both parties had the same understanding of the terms. Once satisfied, the court concluded "we should take the plea," adding "I don't think we need to postpone this any further." In all, the court inquired no fewer than four times as to whether an agreement had been reached, and whether there was any objection to proceeding to take the plea. Affirmative responses were forthcoming from both appellant and his counsel. The court asked whether appellant had had enough time to consult with his attorney concerning the plea agreement. The answer was: "Well, yes, I did." He then confirmed that he was satisfied with his attorney's work.

The appellant then briefly conferred with his attorney, who told the court that appellant wanted the court to "give an opinion of what he's doing." The court responded that its purpose

-4-

was to give the necessary information that defendant would need to make his final decision to plead guilty or not. The judge added that he would consider the recommendation made to him by the government and that "unless something extraordinary pops up in the presentence report," he foresaw no reason why he would not follow the recommendation. This, defendant acknowledged, answered his question.

The court explained the various rights that would be surrendered by the plea — the right to jury trial, in which the determination of guilt or innocence would be subject to the reasonable doubt standard, the right to cross-examine adverse witnesses, the right to offer evidence in his own defense, and the right to testify or remain silent. The court also inquired about the firearms count, eliciting from appellant the information that the firearm had been brought by appellant to his home and placed in a drawer, loaded, his intention being to protect himself in the conduct of his drug trafficking.

The court then commented on the indictment, specifically noting that the mention of 50 grams or more triggered very severe penalties. The appellant replied that he understood the charge. The court queried how much crack cocaine was being stipulated — for purposes of the plea — as being possessed by appellant or as relevant conduct. The prosecution replied that the amount being stipulated was "at least 4 but less than 5 grams of cocaine base."

The prosecution reported that the actual amount of cocaine base seized, as reported by the chemist, was 95.8 grams. This would, he said, yield a BOL of 30 rather than the BOL of 24 specified in the plea agreement.[1] It was at this point that the court told appellant that the government was "giving him a super break," adding the qualification that if the case were to go to trial, the government had to prove that appellant acted willfully.

The change of plea hearing concluded with questions regarding the firearm; the court informed the appellant that it was required to give a consecutive 60-month sentence, should he plead guilty to that count. The appellant stated that he understood what the court was saying but asked a question as to the meaning of the word "consecutive." He asked: "Your honor, does consecutive mean it will be one after the other?" The court confirmed this understanding.

The court then stated that if it followed the recommendation of the plea agreement, appellant would be sentenced to 37 months[2] on the drug charge and 60 months on the firearms charge, for a total of 97 months. The court contrasted the time appellant would have to serve on the first count alone - 97 months

[1]Actually, the 95.8 grams would put the BOL up to 32, as indeed the prosecutor had stated in his letter of August 7.

[2]We note that the government had agreed to reduce its August 7 offer of 46 months on the drug count to 37 months, the minimum time under BOL 21 for one in appellant's criminal history category (I)."

- if there had been a trial and a finding of guilt regarding possession of 50 grams of cocaine base. The court did not reference the mandatory 60 months that would follow consecutively if the appellant was also found guilty of the firearms charge. After ascertaining that nobody threatened or made promises to appellant, the court received the prosecution's proffer of evidence that the United States would offer at trial, and such evidence was accepted by appellant. The session closed with the statement of the court that the appellant was "really getting a good deal" on account of the government's drug quantity stipulation.

Apparently as a result of conversations with other attorneys and inmates while at the detention center, appellant came to regret his decision to plead guilty. He refused to sign the memorialization of the plea agreement, and, in October 2001, filed a pro se motion to withdraw his plea and to change counsel. New counsel for appellant subsequently filed a further motion to withdraw the plea in February 2002. Following an evidentiary hearing, the district court denied the motion to withdraw. The appellant was sentenced on October 16, 2002 to 37 months' imprisonment on the drug charge and 60 months' imprisonment on the firearms charge, to be served consecutively.

## II. Analysis

Appellant describes a poignant scene — that of a young man, with a family, a first-time offender, whose opportunity to

discuss a proffered plea agreement with his lawyer arose only on the brink of a scheduled change of plea hearing.  Facing a potential sentence that threatened to incarcerate him for the rest of his younger years, he was called upon to decide, after minimal opportunity for deliberation or consultation with his attorney, whether or not to accept a plea agreement, the terms of which had just been conveyed to him.  He further points to signs of his uncertainty during the hearing:  his distinct "Well" before saying he had had enough time to consult his attorney, his request for advice from the court, and his uncertainty about the meaning of "consecutive."  He argues that these deficiencies evidenced his lack of understanding of the charges against him and thus rendered his plea involuntary.

He also identifies three statements by the court as invading the forbidden territory of a plea negotiation:  the suggestion that the plea be taken immediately, and the court's two references to the plea agreement as constituting "a super break" and "really . . . a good deal."  He asserts the classic argument against judicial intervention in plea negotiations, which is explicitly proscribed by Fed. R. Crim. P. 11(c)(1)[3] — that words of

_____

[3]The relevant portion of Rule 11(c)(1) reads:
> **In General.**  An attorney for the government and the defendant's attorney, or the defendant when proceeding pro se, may discuss and reach a plea agreement. The court must not participate in these discussions.

wisdom from a judge are all too likely to be coercive; that the judge's impartiality may be diminished; and that his role may appear to be that of an advocate rather than that of a neutral. See United States v. Bierd, 217 F.3d 15, 19 (1st Cir. 2000); United States v. Daigle, 63 F.3d 346, 348 (5th Cir. 1995). We first consider the court's role in the plea process and then address the involuntariness claim.

### III. Alleged Participation in Plea Negotiations

We face a threshold question whether the court's comments at the change of plea hearing were made during the plea negotiations. While assurances were given the court that the essential terms of the plea agreement had been established, there was no written document signed by appellant. Indeed, the record still contains no document signed by appellant. Furthermore, at the outset of the hearing, the court arguably treated appellant's final decision as one yet to be made. Under the circumstances, we shall assume for the purposes of this case that the court participated in the plea agreement discussions.

If objection had been made in the district court that these statements constituted improper judicial intrusion into plea discussions, the government would have had the burden to demonstrate harmless error. See Fed. R. Crim. P. 11(h). But no such objection was made either at the change of plea hearing or in

Fed. R. Crim. P. 11(c)(1).

either of the two subsequent motions for plea withdrawal.  The standard governing our decision is therefore that of plain error, i.e., at bottom, whether the error, if such occurred, "affected the fairness, integrity or public reputation of judicial proceedings." United States v. Gandia-Maysonet, 227 F.3d 1, 5-6 (1st Cir. 2000) (citing  United States v. Olano, 507 U.S. 725, 732 (1993)).  Under this standard, the burden to establish such broad-ranging effects is upon defendant.  See United States v. Vonn, 535 U.S. 55, 62 n.4 & 65 (2002) (endorsing our approach in Gandia-Maysonet and reciting the burden "on silent defendants generally under the plain error rule to show the error, plain, prejudicial, and disreputable to the judicial system").

This is a very considerable burden.  The court obviously was led to believe that an agreement had been reached.  It took care not to overstate the finality of any negotiations, reserving, as it should, the right to change its opinion for good reason.  The court's suggestion that "we should take the plea" does not, however, rise to the level of inappropriate judicial participation. In context, the comment is most reasonably construed as recognizing that the lack of a written document — though perhaps not the best practice — need not stymie entry of a plea if both sides have the same understanding of the agreement's terms.

The comments about "super break" and "good deal" admittedly could have exercised a considerable influence upon the

appellant. But they were clearly related to a factual and compelling comparison with the risk of conviction following trial. It was, at worst, the difference between the plea bargain term of 97 months or eight years, and the Guidelines term of 181 to 211 months or 15 to 17 years. The information was known to appellant's attorney before the change of plea hearing. We must assume that it was also communicated to appellant. At the very least, if for some reason appellant was acquitted of the firearms count, thus avoiding the 60-month mandatory consecutive sentence under 18 U.S.C. § 924(c)(1), he would still face from 121 to 151 months or 10 to 12-1/2 years. Finally, we note that appellant has not advanced any claim or evidence that he was innocent or that he had a basis for believing that the government's case could not be proven. We therefore conclude that on this record we cannot find plain error.

But this does not end our labors. The very length to which we have gone in describing the events prior to the change of plea hearing and the hearing itself was necessary in order to explain why a facially appealing claim of improper judicial participation in a plea proceeding prior to its solemnization in writing did not, on close analysis, demonstrate a basic unfairness and lack of integrity in the proceeding. The lesson is that however certain a judge may be that an oral agreement is so favorable to a defendant that it is likely to be finalized in documentary form, the judge should refrain from expressing an

opinion.  An ounce of trial-level restraint is worth a pound of appellate deliberation.

## IV.  **Withdrawal of the Plea**

We turn now to appellant's remaining allegations that ineffective communication with counsel, a deficient plea colloquy and the duress of a quick decision so undermined his plea that the court abused its discretion in denying the motion to withdraw. Under Fed. R. Crim. P. Rule 11(d), a defendant may withdraw a plea prior to sentencing only upon showing a "fair and just reason" for the request.  It is axiomatic that a defendant does not have an automatic right to withdraw a plea at that stage.  United States v. Marrero-Rivera, 124 F.3d 342, 347 (1st Cir. 1997).

The well established framework for determining whether a defendant has met the "fair and just" standard requires that we consider the plausibility and weight of the proffered reason for withdrawal, the timing of the request, whether there has been an assertion of innocence, and whether the plea was voluntary, knowing and intelligent.  United States v. Cotal-Crespo, 47 F.3d 1, 4 (1st Cir. 1995).  This last factor is of particular significance, as it implicates the three "core" considerations of protection afforded a defendant under Fed. R. Crim. P. 11, namely, that a defendant must be free from coercion, must understand the charges, and must understand the consequences of the guilty plea.  United States v. Isom, 85 F.3d 831, 835 (1st Cir. 1996).  The district court wrote

a thoughtful and thorough opinion in response to appellant's motion for reconsideration, and we add our comments only on the more salient points raised in appellant's brief before this court.

Appellant's first attack centers on the limited time he had to consider the proffered agreement, which he claims prevented him from understanding the terms of the plea and the charges. Although negotiations with the government began in late July, Pagan was informed of the plea agreement only on August 16, the morning of the hearing. He maintains that his decision to plead guilty stemmed primarily from an overriding concern to be reunited with his family as soon as possible, and that he didn't have adequate time to consider his alternatives. He described his feelings on that day as "Nervous. Scared. And worried."

At the evidentiary hearing on the withdrawal motion, however, he responded that when he first appeared before the court, he felt no pressure to plead guilty. After further probing by his attorney, he said he began to feel pressure after the judge "started asking questions." Although we are not insensitive to the stress inherent in a plea hearing — including the necessary interaction with a potentially intimidating judicial figure — we have said before that "[t]he relevant question for plea withdrawal is not whether the accused was sensitive to external considerations . . . but instead whether the decision to plead was voluntary," United States v. Pellerito, 878 F.2d 1535, 1541 (1st Cir. 1989).

Appellant emphasizes the exigent circumstances of his decision, but our prior cases have upheld plea agreements accepted under similarly tight deadlines.  See United States v. Sanchez-Barreto, 93 F.3d 17, 23 (1st Cir. 1996) (pleas not rendered involuntary by attorney recommendations to accept the bargains offered by the government only on the morning trial was to begin); Isom, 85 F.3d at 833 (affirming denial of motion to withdraw even though defendant first saw the plea agreement five minutes before entering the courtroom).  We discern no evidence of "debilitating emotional strain" that would distinguish this case.  Pellerito, 878 F.2d at 1541.

Furthermore, the district court's exhaustive colloquy reveals that the consequences of the plea and the terms of the agreement were clearly explained to appellant, and that he affirmatively acknowledged his understanding of those explanations. Appellant recites a series of alleged omissions in the plea colloquy, including failing to advise him that he would forfeit his right to present pre-sentence motions, to participate in jury selection, to present his own witnesses at trial, and his right to a unanimous verdict.  However, as the district court noted, none of those specific rights are required elements under Fed. R. Crim. P. 11(b), which governs the substance of the colloquy.

Our review of the court's dialogue with appellant reveals that the court clearly and comprehensively explained both the

rights he was foregoing, as required under Rule 11(b), as well as the precise charges and sentencing details. We have every reason to accord credit to appellant's affirmative responses, particularly as his counsel took care to note that he had graduated from high school and had been an excellent student in his studies at a technical institute. See Cotal-Crespo, 47 F.3d at 6 ("The manner in which the charge is explained and the method for determining the defendant's understanding of the charge will vary from case to case depending upon the complexity of the charges, the capacity of the defendant, and the attendant circumstances.").

The exchanges relied upon by appellant as indicative of his confusion and lack of understanding are, especially in context, not persuasive. First, at the beginning of the proceeding, the appellant, through his attorney, sought advice from the bench as to his decision to plead guilty. While this may suggest some unfamiliarity with the role of the judge in the plea bargaining process, it does not suggest a constitutional deficiency in the voluntariness and intelligence of appellant's decision to plead, particularly since the court accurately explained that the decision rested solely with appellant. Second, although appellant did ask about the definition of "consecutive" with respect to the term of imprisonment, in phrasing his question he himself volunteered the correct definition. The court simply confirmed this understanding.

Appellant characterizes his next argument as a "lack of communication" between appellant and his then counsel, Jesus Rivera Delgado. The district court construed this as a claim of ineffective assistance of counsel, to be evaluated according to the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). See United States v. Ramos, 810 F.2d 308, 314 (1st Cir. 1987) ("At the outset, we hold that, the Strickland v. Washington . . . standard for evaluating [a Rule 11(d)] claim applies to a . . . presentence challenge to a guilty plea."). Both below and on appeal, appellant focused on his limited contact with Rivera prior to the plea hearing, as well as Rivera's failure to file a motion to suppress. The district court's analysis, which followed extensive testimony and cross-examination of Rivera, determined that appellant's claim failed to satisfy the first prong of the Strickland standard because it did not identify "acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland, 466 U.S. at 690.

With respect to the apparently limited communication between appellant and counsel prior to the plea hearing, the district court correctly focused on the fact that at the evidentiary hearing, appellant was given more than one opportunity to raise an objection to counsel's performance. In response to the court's questioning, he confirmed that he had sufficient time to discuss the terms and implications of the plea with counsel, and

that he was satisfied with the work that counsel had done thus far. Although Rivera's diligence may have left much to be desired, we defer to the district court's determination that "many of the purported deficiencies . . . do not appear to be so egregious as to violate Defendant's constitutional rights."

Appellant also contends that the search warrant was defective and that Rivera therefore should have filed a motion to suppress. As further evidence of Rivera's ineffectiveness, appellant points to Rivera's failure to pick up a particular discovery package - potentially relevant to whether the motion to suppress would succeed - until after the time to file defensive motions expired. The district court, however, credited Rivera's testimony that he made a calculated determination not to file a motion to suppress because he felt there was no chance of prevailing. Concerned that a summary denial of the motion would enhance the government's position in any future plea negotiations, Rivera instead decided to use the more questionable aspects of the search as leverage to secure a highly favorable drug quantity stipulation. Furthermore, Rivera stated that he specifically advised appellant against filing a motion to suppress following the preliminary hearing in May 2001. Appellant began pressing the

issue only after his plea hearing, apparently owing to suggestions he received while incarcerated.[4]

Although in retrospect, appellant may have preferred to pursue the riskier path of standing trial, none of these "garden-variety second thoughts" provides a basis for withdrawing the plea. United States v. Richardson, 225 F.3d 46, 52 (1st Cir. 2000); see also Marrero-Rivera, 124 F.3d at 349 ("Nor can the mere fact that [appellant] and counsel may have undervalued the merit of any potential defense render the Rule 11 plea involuntary."); Isom, 85 F.3d at 837 (motion to withdraw must rest on more than "defendant's second thoughts about some fact or point of law")(citations omitted).

A final factor, delay in moving for plea withdrawal, furnishes further support for its denial. The two month lag between the plea hearing and appellant's motion to withdraw places it well within the area of vulnerability because of untimeliness.

---

[4]In the evidentiary hearing on the motion to withdraw, there was some discussion of appellant's contention that he would have been able to challenge the firearms charge under Bailey v. United States, 516 U.S. 137 (1995). While incarcerated, appellant apparently received advice from an undisclosed source (perhaps another inmate or inmate's attorney) that this was a viable argument. In Bailey, the Supreme Court held that punishment under 18 U.S.C. § 924(c), which at the time pertained to those who used or carried a firearm, required "evidence sufficient to show an *active employment* of the firearm." Id. at 143 (emphasis added). Appellant has wisely not made this specific claim on appeal, as it is clear that the relevant portion of 18 U.S.C. § 924(c) has been amended - in direct response to Bailey - to include mere possession in furtherance of a drug trafficking crime. See United States v. Grace, __ F.3d __, 2004 WL 1002568 (1st Cir. 2004).

See <u>Ramos</u>, 810 F.2d at 313 (determining that a thirteen-day delay between hearing and motion to withdraw disfavored defendant); <u>Pellerito</u>, 878 F.2d at 1541 (eight-week delay between plea and motion to withdraw weighed against defendant).

<u>The decision of the district court denying the motion to withdraw the plea is affirmed.</u>