# United States Court of Appeals
## For the First Circuit

No. 18-1465

UNITED STATES OF AMERICA,

Appellee,

v.

ERICK LEVAR ADAMS,
a/k/a X, a/k/a DEUCE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Thompson, Selya, and Barron,
Circuit Judges.

Mary June Ciresi for appellant.
Benjamin M. Block, Assistant United States Attorney, with
whom Halsey B. Frank, United States Attorney, was on brief, for
appellee.

August 18, 2020

**SELYA**, **Circuit Judge**. Under the Constitution, a warrant authorizing the search of property cannot issue except upon a showing of probable cause. See U.S. Const. amend. IV. Under this standard, such a warrant may issue only upon a showing that a crime has been committed and that evidence of that crime is likely to be found by a search of the designated property. See United States v. Clark, 685 F.3d 72, 78 (1st Cir. 2012). In the case at hand, defendant-appellant Erick Levar Adams, convicted of drug-trafficking and firearms offenses, challenges the district court's refusal to suppress the avails of a number of warrant-backed searches. Concluding, as we do, that each of the challenged warrants issued upon a sufficient showing of probable cause and that the defendant's other claims of error lack bite, we affirm his conviction and sentence.

## I. BACKGROUND

We rehearse the facts as supportably found by the district court following an omnibus hearing on several of the defendant's motions to suppress. When appropriate, we supplement these findings with uncontested facts drawn from the broader record. See United States v. Dancy, 640 F.3d 455, 458 (1st Cir. 2011).

In December of 2014, two state police troopers stopped a rental car being driven by the defendant near Sanford, Maine. After learning that the defendant was driving without a valid

license, the troopers arrested him. A post-arrest search of the defendant's person revealed that he was carrying approximately $500 in cash.

During the course of the stop, Special Agent Randall Medeiros of the Maine Drug Enforcement Agency (MDEA) was summoned to the scene. The officers then conducted two separate canine sniffs directed at the car. Both dogs alerted to the presence of drugs in the passenger compartment. An ensuing search of the passenger compartment and a backpack found in the backseat of the car disclosed three cellphones, the cut corner of a plastic bag (resembling a "Dominican tie" commonly used to package drugs), and two loose screws (suggesting that parts of the rental car had been disassembled, perhaps to hide drugs).

The car was towed to a police barracks, and a search warrant was procured. The search revealed two additional cellphones but no contraband. The defendant was allowed to leave but — approximately one month later — Medeiros obtained search warrants for the contents of the five cellphones.

The MDEA was not the only law enforcement agency interested in the defendant. Roughly two months after the 2014 traffic stop, police officers in Connecticut obtained a search warrant for an apartment rented by the defendant. During the ensuing search, officers found (among other things) large

quantities of cocaine and heroin, along with drug-packaging accoutrements.

Meanwhile, the MDEA continued its investigation of the defendant's activities. Several confidential informants told the authorities that the defendant and his associates were dealing drugs in and around Biddeford, Maine. Agents proceeded to arrange a number of controlled drug buys from the defendant's associates and coordinated one buy from the defendant himself. The Maine probe reached a climax in January of 2016 when agents secured arrest warrants for the defendant and one of his associates, pinpointed their location at a hotel in Saco, and secured a no-knock search warrant for the particular hotel room in which the two men were staying. Prior to executing the arrest warrant, agents observed the defendant leave the hotel and retrieve a black bag from a parked blue Volkswagen. Later — when executing the arrest warrants — the officers observed drugs and drug paraphernalia scattered in plain view throughout the hotel room. They also saw drugs in the bag the defendant had retrieved from the blue Volkswagen.

Based on these observations, the officers obtained an additional warrant authorizing searches of both the hotel room and the Volkswagen. A thorough search of the hotel room unearthed substantial quantities of heroin, cocaine, and cocaine base (crack cocaine), together with approximately $27,000 in cash.

- 4 -

One thing sometimes leads to another, and the Volkswagen search turned up paperwork for a storage locker in the name of the girlfriend of one of the defendant's associates. The agents visited the storage facility and viewed video footage depicting the man who had been sharing the hotel room with the defendant driving the Volkswagen and entering the storage unit about twenty-four hours earlier. Once a canine sniff produced a positive alert for the presence of narcotics inside the storage locker, another search warrant was obtained. This search yielded firearms and additional drugs.

In due season, a federal grand jury sitting in the District of Maine charged the defendant (in a superseding indictment) in five counts. Only two counts are relevant for present purposes: count 1 charged the defendant with conspiracy to possess with intent to distribute and to distribute at least 280 grams of cocaine base and unspecified quantities of other drugs, see 21 U.S.C. §§ 841(a)(1), 846, and count 4 charged him with possession of a firearm by a felon, see 18 U.S.C. §§ 922(g)(1), 924(e). The defendant initially maintained his innocence and filed a flurry of motions to suppress evidence stemming from the seizures and searches of the cellphones, the hotel room, and the storage locker. After an omnibus evidentiary hearing, the district court denied all of the motions. The defendant subsequently moved to suppress evidence gleaned from the

search of the Connecticut apartment, and the court denied this motion on the papers.

Jury selection was set to begin on June 5, 2017. A few days before, the defendant entered a conditional guilty plea to counts 1 and 4, see Fed. R. Crim. P. 11(a)(2), reserving the right to appeal the district court's denials of his suppression motions. Specifically, his conditional plea allowed him only "to have an appellate court review" the district "court's decisions dated November 29, 2016 and May 12, 2017 on [his] Motions to Suppress." In exchange, the government agreed to dismiss the remaining charges and to recommend a sentence of between 180 and 300 months. The district court accepted this binding plea agreement.

A little under one month after the change-of-plea hearing, the defendant moved to retract his guilty plea. Following a further hearing, the district court denied the motion. Some months later, the defendant moved unsuccessfully for reconsideration of the earlier denials of the plethora of suppression motions. At the disposition hearing, the court sentenced the defendant to a 300-month term of immurement. This timely appeal followed.

**II. ANALYSIS**

We subdivide our discussion of the defendant's asseverational array into four segments.[1] First, we treat with the 2014 traffic stop. Second, we deal sequentially with the defendant's attacks on the cellphone warrants, the warrant authorizing the search of the Connecticut apartment, the no-knock warrant, and the storage locker warrant.[2] Third, we summarily dispose of the defendant's vain attempt to secure review of the district court's denial of his motion to reconsider its earlier suppression rulings. Fourth, we train the lens of our inquiry on the district court's denial of the defendant's motion to withdraw his guilty plea.

## A. The Traffic Stop.

We start with the defendant's remonstrances about the 2014 traffic stop that led to the seizure of the five cellphones. Although we start there, these remonstrances soon encounter

---

[1] We note that the defendant has augmented his counsel's briefing with pro se briefing. For simplicity's sake, we address the preserved and properly developed arguments contained in these various briefs without attributing particular arguments to particular briefs. Any claims of error not addressed in this opinion are either insufficiently developed, patently meritless, or both, and all such claims are rejected without further elaboration.

[2] Each of the challenged warrants was issued following the submission of a warrant application. In turn, each application incorporated a supporting affidavit or affidavits executed by one or more law enforcement officers. We refer throughout to these affidavits without pausing to identify the particular affiant(s).

insurmountable obstacles.  The defendant never raised any of them in his myriad motions to suppress and, in all events, they are foreclosed by the terms of his conditional plea.

Federal Rule of Criminal Procedure 11(a)(2) allows a defendant, "[w]ith the consent of the court and the government," to enter a conditional guilty plea "reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion."  A primary purpose of this rule is to "'identify precisely what pretrial issues have been preserved for appellate review,' and to husband scarce judicial resources by permitting a defendant fully to litigate hoarded issues while at the same time lessening the burden on busy district courts and sparing the sovereign the expense of trial." United States v. Caraballo-Cruz, 52 F.3d 390, 392 (1st Cir. 1995) (quoting Fed. R. Crim. P. 11 advisory committee's note to 1983 amendment).  Virtually any and all nonjurisdictional issues not explicitly preserved for appeal in the conditional plea agreement — and certainly all Fourth Amendment suppression issues — are deemed waived.[3]  See United States v. Anderson, 374 F.3d 955, 958 (10th Cir. 2004); United States v. Ramos, 961 F.2d

_____

[3] We say "[v]irtually" because the Supreme Court has made clear that a guilty plea does not waive a subsequent challenge to "the Government's power to 'constitutionally prosecute'" the defendant.  Class v. United States, 138 S. Ct. 798, 805 (2018) (quoting United States v. Broce, 488 U.S. 563, 575 (1989)).

1003, 1005-06 (1st Cir. 1992), overruled on other grounds by United States v. Caron, 77 F.3d 1 (1st Cir. 1996) (en banc); United States v. Simmons, 763 F.2d 529, 533 (2d Cir. 1985).

Under the terms of his conditional plea, the defendant reserved the right to appeal only the district court's two suppression rulings, namely, the omnibus order entered on November 29, 2016, and the order entered on May 12, 2017 (which denied the motion to suppress the fruits of the Connecticut apartment search). Neither of those rulings was directed to the validity of the traffic stop or the actions that followed at the site of the stop. On its face, then, the conditional plea did not reserve any right to challenge the traffic stop on appeal.

To be sure, the district court's first suppression ruling (November 29, 2016) touched on the traffic stop. But this was purely by way of background. For instance, the court memorialized that "there [was] no issue concerning whether the officers unreasonably prolonged the stop to effectuate the dog sniffs" since the defendant had already been arrested at the time of the sniffs. So, too, the court wrote that the roadside search of the defendant's vehicle and backpack were justified by the dogs' positive alerts for the presence of contraband and by the automobile exception to the warrant requirement. See, e.g., Carroll v. United States, 267 U.S. 132, 153-56 (1925); United States v. Maldonado, 356 F.3d 130, 137 (1st Cir. 2004).

- 9 -

We conclude that the court's references to these matters are plainly insufficient to reserve the traffic stop for appeal when the motions to suppress never challenged that stop and the defendant himself never raised any such challenge during the suppression hearing. This conclusion is strengthened by the fact that the defendant, during the lead-up to the omnibus suppression hearing, never argued that the traffic stop was unsupported by reasonable suspicion or probable cause; that the stop was unlawfully prolonged; or that the canine sniffs and subsequent search of the car were unlawful. And to remove all doubt, the district court stated unequivocally in its omnibus suppression ruling that the defendant did "not appear to challenge the basis for the initial stop of the vehicle," and the defendant's subsequent filings did not contradict this statement.

It is a commonsense proposition that defendants who choose to enter conditional guilty pleas must "use care and precision in framing the issues to be preserved for appeal." Simmons, 763 F.2d at 533 (quoting United States v. Pinto-Mejia, 720 F.2d 248, 256 (2d Cir. 1983)). The natural corollary of this proposition is that conditional plea agreements are to be construed according to their tenor. See Ramos, 961 F.2d at 1005-06; Simmons, 763 F.2d at 533. Here, the conditional plea agreement, fairly read, does not encompass the traffic-stop claims that the defendant now seeks to pursue. Consequently,

those claims have been waived, and the defendant is foreclosed from raising them in this appeal. See Anderson, 374 F.3d at 958 (explaining that entry of conditional plea waives all suppression arguments not specifically preserved for appeal); cf. United States v. Dietz, 950 F.2d 50, 55 (1st Cir. 1991) ("[A]rguments not seasonably addressed to the trial court may not be raised for the first time in an appellate venue.").

## B.  The Warrants.

The defendant contends that a constellation of search warrants used to gather evidence against him were unsupported by probable cause or were otherwise infirm.  The contested warrants authorized, respectively, searches of the five seized cellphones, a search of the defendant's Connecticut apartment, an entry into the defendant's hotel room, and a search of the storage locker.

Before turning to the warrants, we offer a handy primer on some matters of general application.  When reviewing a district court's disposition of a motion to suppress, we screen the court's factual findings for clear error and assay its ultimate conclusions about the existence of probable cause de novo.  See United States v. Almonte-Báez, 857 F.3d 27, 31 (1st Cir. 2017).  In conducting this tamisage, we construe the record in the light most congenial to the district court's ruling and will affirm the court's denial of a suppression motion "as long as that denial is supported by any particularized and objectively reasonable view of the

evidence."  United States v. Tanguay, 811 F.3d 78, 81 (1st Cir. 2016).

As relevant here, a finding of probable cause is righteous "when the totality of the circumstances create 'a fair probability that contraband or evidence of a crime will be found in a particular place.'"  Almonte-Báez, 857 F.3d at 31 (quoting United States v. Tanguay, 787 F.3d 44, 50 (1st Cir. 2015)); see United States v. Coombs, 857 F.3d 439, 446 (1st Cir. 2017).  The probable cause standard "is not a high bar."  Kaley v. United States, 571 U.S. 320, 338 (2014).  It demands only "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'"  Florida v. Harris, 568 U.S. 237, 244 (2013) (alteration in original) (quoting Illinois v. Gates, 462 U.S. 213, 231, 238 (1983)).

A showing of probable cause may be premised on either direct or circumstantial evidence or some combination of the two. See Gates, 462 U.S. at 238; Clark, 685 F.3d at 78.  Such a showing leaves ample room for reasonable inferences based on common experience:  an affidavit submitted to show probable cause need not point to some straight-line connection but, rather, may rely on the affiant's connecting of a series of dots in a commonsense way.  See Harris, 568 U.S. at 244.

It is against this backdrop that we consider the defendant's challenges to the sundry warrants.

1.  **The Cellphone Warrants.**  We start with the warrants authorizing searches of the five cellphones recovered in the wake of the traffic stop.  As might be expected, the affidavits underpinning the five cellphone warrants closely resemble one another, and we discuss them in the aggregate.  The defendant's criticism of these warrants focuses on Medeiros's statement, contained in the affidavits annexed to the warrant application, that the defendant had "been observed at several known drug locations in the Southern Maine area over the course of several months."  The defendant suggests that this statement lacked any factual context or indicia of reliability.  He adds that when this "unsubstantiated assertion" is removed from the probable cause equation, the remaining information is too meager to support a finding of probable cause to believe that the phones were likely to contain evidence of drug trafficking.

It is true, of course, that an affidavit submitted in support of a warrant application must demonstrate probable cause "in some trustworthy fashion."  United States v. Nocella, 849 F.2d 33, 39 (1st Cir. 1988) (quoting United States v. Aguirre, 839 F.2d 854, 857 (1st Cir. 1988)).  Similarly, if data points limned in an affidavit derive from confidential informants, a reviewing court must take into account "the veracity and reliability of [those] informants, and the basis of their knowledge."  Id.  Here, however, the disputed statement is not attributed to information gleaned

- 13 -

from an informant. And in our judgment, a neutral magistrate would be fully justified in deeming the sworn statements of an experienced MDEA agent, presumably based on his knowledge of the ongoing investigation, as trustworthy. After all, "[w]e have, with a regularity bordering on the echolalic, endorsed the concept that a law enforcement officer's training and experience may yield insights that support a probable cause determination." United States v. Floyd, 740 F.3d 22, 35 (1st Cir. 2014).

In any event, we need not probe this point too deeply. Even if we excise the disputed statement from the probable cause calculus, the remaining content of each affidavit amply supported a finding of probable cause. The affidavits rehearsed the details of the traffic stop, including the $500 found on the defendant's person in small-denomination bills; the two positive dog sniffs; and the items found as a result of the traffic stop, including the five cellphones, the distinctively tied plastic bag, and the loose screws. In addition, the affidavits contained Medeiros's averments that drug traffickers often use multiple cellphones to arrange transactions, package drugs in plastic bags using the "Dominican tie" technique, and stow drugs in a vehicle's "natural voids" accessible only after the removal of plastic molding held in place by "screws or clips."

Direct evidence is not necessary to ground a probable cause determination where, as here, the import of circumstantial

- 14 -

evidence is obvious.  See United States v. Gonzalez-Arias, 946 F.3d 17, 24 (1st Cir. 2019), cert. denied, __ S. Ct. __ (2020); United States v. Edmiston, 46 F.3d 786, 789 (8th Cir. 1995). Notwithstanding that the car itself was not found to contain a detectable quantity of drugs, all of the enumerated facts strongly suggested drug-trafficking activities.  See, e.g., Harris, 568 U.S. at 245-46, 246 n.2 (noting that police dogs alert to odor, but not necessarily presence, of drugs and that such alerts establish probable cause "that either drugs or evidence of a drug crime . . . will be found").  Taken in their totality, the inference that they suggest is inescapable.

To cinch the matter, the affidavit also recounted that the defendant had been arrested twice before, resulting in narcotics charges.  Both arrests occurred in Rhode Island in 2013, and both involved facts strikingly similar to the 2014 traffic stop in Maine.  In each instance, the defendant was operating a rental car, driving without a valid license, and found in possession of multiple cellphones and significant amounts of cash. These earlier arrests — in each of which several ounces of crack cocaine was seized — combined with the evidence harvested from the 2014 traffic stop gave rise to probable cause to believe that the defendant had been, and continued to be, involved in a drug-trafficking enterprise.

The defendant has a fallback position. He argues that the passage of approximately one month between the 2014 traffic stop and the issuance of the search warrants for the five cellphones undermined any finding of probable cause since "[n]o additional information" suggestive of drug trafficking emerged in the interim. This argument lacks force. We have "repeatedly refused to assess an affidavit's staleness by counting the number of days between the events described in the affidavit and a warrant's issuance, as a merchant would beads on an abacus." United States v. Tiem Trinh, 665 F.3d 1, 13 (1st Cir. 2011). Instead, we examine a variety of factors bearing on staleness, such as "the nature of the information [in the affidavit], the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." Id. at 13-14 (quoting United States v. Morales-Aldahondo, 524 F.3d 115, 119 (1st Cir. 2008)). As we already have explained, the evidence garnered from the 2014 traffic stop, coupled with the known details of the defendant's 2013 arrests, gave rise to probable cause to believe that he had been engaged in a continuous course of drug-trafficking and that the multiple cellphones recovered from the traffic stop were tools of the trade and, thus, likely to contain evidence of criminal activity. The passage of approximately one month between the seizure of the phones and the issuance of the warrant in no way diminished the likelihood that the phones would contain

incriminating evidence.  Cf. United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996) (explaining that "drug conspiracies tend to be ongoing operations, rendering timely information that might, in other contexts, be regarded as stale").

That is game, set, and match.  The affidavits submitted in connection with the applications for the five cellphone warrants contained more than enough information to justify a finding of probable cause to believe that the defendant was engaged in drug trafficking and that the cellphones were likely to contain evidence of that activity.  The motion to suppress the fruits of the cellphone searches was, therefore, appropriately denied.

**2.  The Connecticut Apartment Warrant.**  We turn next to the warrant authorizing a search of the apartment in Norwich, Connecticut.  The defendant contends that this warrant was not supported by probable cause sufficient to show that the apartment likely contained evidence of drug trafficking. The record, though, tells a different tale.  The affidavit annexed to the application for the challenged warrant contains more than enough information to underpin a finding of probable cause.

Collectively, the two affidavits that underpinned the issuance of this warrant recount various encounters by police officers with the Connecticut apartment.  In December of 2014, officers observed a suspect in an unrelated murder investigation enter and leave an apartment (later identified as Apartment #3) on

- 17 -

the third floor of the apartment building. The following February, officers learned that the murder suspect had visited "Apartment #3" three months earlier to retrieve a handgun. Also in February, officers encountered one Larry Miliner, an associate of the suspect, outside the apartment building and in possession of cocaine. Miliner said that, roughly an hour before the officers' arrival, he had entered the same apartment that the murder suspect previously had visited. The police identified this apartment as Apartment #3. Upon further inquiry, Miliner stated that it was rented by his cousin "Eric" and also stated that the apartment housed both "an aggressive pitbull" and "several other dogs locked within a bedroom." When pressed for further details about the apartment, he "became uncooperative."

When queried, the property manager identified "Eric Adams" as the tenant renting Apartment #3. He reported that Adams had not been seen in the vicinity for over a month. The affiants then noted — drawing on their collective experience — that drug traffickers often maintain "stash houses" for the storage of drugs and firearms and that these sites are "commonly protected by canines" and frequented by dealers for only short periods of time. Finally, the affiants observed that Adams was known to be a "member[] of the Bloods street gang" and had "recently been investigated for trafficking large amounts of cocaine" in Maine.

While these facts, if taken in isolation, may leave room for innocent explanation, we conclude that, taken together, they form an adequate basis for a finding of probable cause to believe that Apartment #3 was being maintained as a stash house and would likely contain evidence of drug trafficking. Cf. Bourjaily v. United States, 483 U.S. 171, 180 (1987) ("The sum of an evidentiary presentation may well be greater than its constituent parts."). The defendant resists this conclusion. His argument, though, is easily dispatched.

One pillar of the defendant's argument is that Miliner never told the officers that the drugs found on his person came from Apartment #3. This is true as far as it goes, but it does not take the defendant very far. According to the affidavit, Miliner was found with drugs on his person, and he stated that he had been in an apartment that the officers identified as Apartment #3 roughly an hour before the officers' arrival. This information took on added importance when, after a search, Miliner's own apartment was found to be free of drugs. One reasonable inference that could be drawn is that the drugs recovered from Miliner's person came from Apartment #3. See Tanguay, 811 F.3d at 81 (explaining that reviewing courts must affirm denials of suppression motions that are "supported by any . . . objectively reasonable view of the evidence").

- 19 -

Another pillar of the defendant's argument is his assertion that the information concerning the murder suspect's retrieval of a gun from Apartment #3 had grown stale by the time the officers were told about this event three months later. We think that the district court had room to find that this information was not stale, see Tiem Trinh, 665 F.3d at 13-14; and in any event, the officers' encounter with Miliner took place on the very same day that the warrant authorizing a search of Apartment #3 was issued. The information gleaned from that encounter, when fused with the officers' knowledge of the defendant's involvement in gang activities and drug trafficking, was enough to support a finding of probable cause for the search. See Almonte-Báez, 857 F.3d at 32.

That ends this aspect of the matter. The remainder of the defendant's arguments either depend upon information that is dehors the record or relate to matters that are only of marginal relevance to the probable cause calculus. Reading the affidavits in their entirety and drawing reasonable inferences to the district court's behoof, we hold that the court did not clearly err in denying the defendant's motion to suppress the fruits of the Connecticut apartment search.

3. **The No-Knock Warrant.** The defendant next trains his fire on the warrant authorizing a no-knock entry into his hotel room for the purpose of executing previously issued arrest warrants

for the defendant and his confederate.  Once again, he is shooting blanks.

At the outset, the defendant suggests that the factual allegations contained in the underlying affidavit were inadequate to permit a finding of probable cause to search the hotel room. This suggestion is hopeless.  The affidavit remarked the existence of an outstanding arrest warrant for the defendant and described both cellphone location data and physical surveillance establishing the defendant's presence at the hotel.  No more was exigible to make out a sufficient showing of probable cause.

There is also a second, independently sufficient, reason why this challenge fails:  the defendant attempts to raise it for the first time on appeal.  We have held, with unrivaled consistency, that (subject to narrow exceptions, not relevant here) legal theories cannot make their debut in the court of appeals.  See Teamsters Union, Loc. No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

The defendant does have one preserved argument implicating the hotel room warrant.  In the court below, he argued that the no-knock provision of the warrant was unsupported.

Although the defendant renews this argument on appeal, he gains no traction from it.

Urging us to find an insufficient factual basis for the no-knock provision, the defendant seizes upon the affiant's statement that "drug traffickers often keep firearms with them to protect their product." He insists that "boilerplate language" in the affidavit was inadequate to support a no-knock entry in the absence of some particularized basis for believing that the defendant was armed. The defendant, however, leans too heavily on a dysphemism that does not fit.

Although law enforcement officers executing a warrant ordinarily must knock and announce their presence, a magistrate may authorize a no-knock entry if the applicant offers reasonable grounds to expect that the typical knock-and-announce procedure "would be dangerous or futile, or . . . would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." United States v. Banks, 540 U.S. 31, 36 (2003) (alteration in original) (quoting Richards v. Wisconsin, 520 U.S. 385, 394 (1997)); see United States v. Jones, 523 F.3d 31, 36 (1st Cir. 2008). In the case at hand, the affidavit submitted with the no-knock warrant application established reasonable grounds to think that the defendant and his confederate might be armed. It described evidence gathered from confidential informants indicating that the two men were engaged in drug

trafficking.  This evidence included descriptions of controlled buys and contained assurances from an informant that the defendant "ke[pt] his shit" at the hotel.  We have previously deemed it "a commonsense inference" that drug traffickers often keep firearms on hand to protect "drug cash and spoils from any would-be robbers."  United States v. Rivera, 825 F.3d 59, 65 (1st Cir. 2016) (explaining that this inference derives "from the everyday understanding of the drug trade's violent nature").  Drawing this commonsense inference, we conclude that the facts delineated in the affidavit justified the inclusion of a no-knock provision in the warrant.

**4.  The Storage Locker Warrant.**  This brings us to the warrant authorizing the search of the storage locker rented by the girlfriend of one of the defendant's associates.  The defendant claims that this warrant was not supported by a showing of probable cause to believe that the storage locker was likely to contain contraband or other evidence of drug trafficking.  Relatedly, he claims that the authorities had no reason to connect anything in the locker to him.  These claims do not withstand scrutiny.

To begin, the affidavit underpinning the warrant painstakingly recounted the events leading up to the defendant's arrest, including the affiant's observations of the defendant leaving the hotel and retrieving a bag from the blue Volkswagen. This account went on to catalog the contraband seen inside the

- 23 -

hotel room and in the bag that the defendant had retrieved. Then, it described the paperwork for the storage locker found in a subsequent warrant-backed search of the blue Volkswagen and noted the existence of video footage showing the defendant's associate accessing the locker shortly before the defendant's arrest. Finally, it revealed that a canine sniff performed immediately outside the storage locker had yielded a positive alert. Taken in the ensemble, the facts contained within the four corners of the affidavit comprised a solid predicate for a finding of probable cause to believe that the storage locker was likely to contain proof of the defendant's suspected drug trafficking.

There is one loose end. The defendant asserts that the affidavit underpinning the storage locker warrant included "intentionally or recklessly false information" and that the district court brushed off his request for a hearing about these supposed infirmities. See Franks v. Delaware, 438 U.S. 154, 155-56 (1978); see also United States v. Barbosa, 896 F.3d 60, 67-69 (1st Cir. 2018) (outlining requirements for Franks hearing challenging veracity of warrant application). This assertion, though, lacks a foothold in the record: the defendant never requested a Franks hearing concerning this affidavit.[4] Seen in

---

[4] The record citation that he furnishes in support of this claim of error relates to his request for a Franks hearing about the affidavit connected with the no-knock warrant for his hotel room. That Franks claim has not been pursued on appeal.

- 24 -

this light, the defendant's claim of error falls squarely within the general rule that a party cannot ask the court of appeals for relief that he did not seek in the district court. See United States v. Tkhilaishvili, 926 F.3d 1, 18 (1st Cir.), cert. denied, 140 S. Ct. 412 (2019); Beaulieu v. IRS, 865 F.2d 1351, 1352 (1st Cir. 1989).

## C. **The Motion to Reconsider.**

We need not linger long over the defendant's challenge to the district court's denial of his motion to reconsider various suppression rulings. As we explain below, this challenge does not make it out of the starting gate.

To begin, we note a temporal anomaly. As said, the plea agreement makes pellucid that the defendant may appeal only the district court's orders denying his motions to suppress, that is, the orders entered on November 29, 2016, and May 12, 2017, respectively. On its face, then, the order denying the motion to reconsider appears to fall outside the boundaries of these reserved appeal rights. Because the conditional plea in this case reserved to the defendant only the right to appeal those suppression rulings specified in the plea condition, it would seem likely that the defendant has waived any right to appeal the denial of the motion to reconsider.

The problem, though, is that the motion to reconsider was not filed until December 1, 2017, months after the district

court's acceptance of the defendant's conditional guilty plea. We have been unable to find any persuasive authority applying a conditional plea agreement's preclusive effect to a pretrial motion filed <u>after</u> the conditional plea was accepted. Here, however, we need not venture onto terra incognita and try to resolve this conundrum: there is another — and fully dispositive — reason why this claim of error goes up in smoke.

This dispositive reason rests on a familiar principle. That principle relates to the novelty of the contents of the motion to reconsider. Although the motion purported to challenge the denial of the defendant's earlier suppression motions, it featured an array of entirely new arguments. "[I]t is settled beyond hope of contradiction that, at least in the absence of exceptional circumstances, a party may not advance new arguments in a motion for reconsideration when such arguments could and should have been advanced at an earlier stage of the litigation." <u>Carib. Mgmt. Grp.</u> v. <u>Erikon LLC</u>, ___ F.3d ___, ___ (1st Cir. 2020) [No. 19-1421, slip op. at 21]; <u>accord</u> <u>Mancini</u> v. <u>City of Providence ex rel. Lombardi</u>, 909 F.3d 32, 48 (1st Cir. 2018); <u>United States</u> v. <u>Allen</u>, 573 F.3d 42, 53 (1st Cir. 2009). Since the new arguments advanced in the motion for reconsideration were available to the defendant both at the times that he moved to suppress and when he entered his plea and since the circumstances of this case are in no way exceptional, he is foreclosed from raising those new

arguments for the first time on appeal. Consequently, his claim of error dies aborning.

### D. The Plea-Withdrawal Motion.

The defendant has one last shot in his sling. He assigns error to the district court's denial of his motion to withdraw his conditional guilty plea. Some stage-setting helps to lend perspective.

A criminal defendant "has no absolute right to withdraw a guilty plea." United States v. Caramadre, 807 F.3d 359, 366 (1st Cir. 2015). Where, as here, a defendant moves to withdraw a guilty plea after the district court has accepted the plea but before sentencing, he bears the burden of establishing "a fair and just reason for requesting the withdrawal." Id. (quoting Fed. R. Crim. P. 11(d)(2)(B)). The most important integer in the plea-withdrawal calculus is whether the defendant's "original guilty plea was knowing, intelligent, and voluntary." Id. Of course, an inquiring court also should consider other factors, such as "the plausibility and weight of the reason given for the withdrawal, the timing of the request, whether the defendant is now colorably asserting legal innocence, and whether the original plea was pursuant to a plea agreement." Id. (quoting United States v. Aker, 181 F.3d 167, 170 (1st Cir. 1999)). If the totality of these factors militates in favor of allowing the plea to be withdrawn,

the court should then consider whether, and to what extent, withdrawal would prejudice the government.  See id.

We review a district court's denial of a motion to withdraw a guilty plea for abuse of discretion.  See United States v. Dávila-Ruiz, 790 F.3d 249, 251 (1st Cir. 2015).  "An abuse of discretion 'occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them.'"  United States v. Soto-Beníquez, 356 F.3d 1, 30 (1st Cir. 2003) (quoting Indep. Oil & Chem. Workers, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988)).

In this instance, the defendant submits that his guilty plea was neither knowing nor voluntary when tendered because he had insufficient time to digest late-breaking discovery and to consider the government's final plea offer.  In addition, the defendant says that the looming prospect of a potential life sentence and concerns about his family clouded his judgment and rendered his guilty plea involuntary.  Following a hearing at which the defendant testified, the district court rejected these importunings and found that the defendant's original plea was knowing, intelligent, and voluntary.  The court emphasized that the defendant — who was no "neophyte in dealing with the [criminal justice] system" — had engaged in "fairly extensive plea

negotiations" and had not made a "spur-of-the-moment" decision. In the court's view, the defendant was simply having "second thoughts" about his earlier capitulation.

We discern nothing resembling an abuse of discretion in the district court's determination that the defendant failed to establish a fair and just reason for withdrawing his guilty plea. There is no indication that the court overlooked any material factor, relied upon any improper factor, or made a serious mistake in judgment when weighing the relevant considerations. We add only a few brief comments.

To begin, the defendant's contention that he had insufficient time to consider belated discovery is unconvincing. The defendant's chief complaint in this respect relates to the production, shortly before the planned commencement of jury selection, of the full arrest record of one of the participants in a controlled drug buy. This record included two arrests, at least one of which was for drug possession. As the defendant tells it, this arrest record "bolstered his defense."

But there is a rub. The defendant had long been aware of the affidavit underpinning the no-knock search warrant, which made clear that this particular confidential informant had been arrested for drug possession after the controlled buy and subsequently terminated as an informant. The upshot is that the defendant — when filing his motions to suppress and thereafter —

had available enough information to argue that the confidential informant's drug use and difficulties with the law rendered her unreliable. And to seal the deal, the defendant and his counsel received all the remaining information about the confidential informant at least a few days before the defendant decided to enter a conditional guilty plea.[5] It follows that, before deciding to plea, the defendant had adequate time to weigh whether the confidential informant's full arrest history might strengthen his defense.

The defendant's remaining arguments in favor of allowing him to withdraw his plea are equally unavailing. Although we do not doubt that the defendant may have felt "[p]ressured by the prospect of a life sentence" and the potential hardship such a sentence would inflict on "his ailing mother and his children," many criminal defendants labor under the strain of such considerations. See United States v. Pellerito, 878 F.2d 1535, 1541 (1st Cir. 1989) (explaining that criminal prosecutions are inherently "stressful experiences" and that "many defendants" are

---

[5] The record is murky as to exactly when the defendant received this information — but it is beyond dispute that he received it before he entered his conditional plea. The government told the district court that full arrest histories had been provided to the defendant roughly three weeks before the defendant tendered his plea. The defendant maintains, though, that he received the information just days before he pleaded. Either way, it is apparent that the defendant and his counsel had at least a few days to review the confidential informant's full arrest record and decide whether to proceed with plea negotiations.

"sensitive to external considerations" such as familial pressures). A defendant seeking to unravel a guilty plea "must show more than a mere 'sensitiv[ity] to external considerations.'" Caramadre, 807 F.3d at 369 (alteration in original) (quoting Pellerito, 878 F.2d at 1541). Instead, such a defendant must show that he pleaded guilty "under so much duress that [his plea] could no longer be considered a product of free will." Id. Evidence of agitation arising out of familial circumstances does not, without more, show duress or lack of voluntariness. See Pellerito, 878 F.2d at 1541. In this case, there is no "more."

Nor is the needle moved by the defendant's argument that he "did not have sufficient time" to consider the government's final plea offer. Although he says that he had only ninety minutes to weigh the offer, there is nothing to suggest that this was a hard deadline imposed by the government. At any rate, the record makes manifest that plea negotiations were ongoing throughout the week that jury selection was slated to begin and that the defendant had several meetings with his attorney during the course of that week with respect to the government's offers. A defendant's participation in the plea negotiation process is a highly relevant fact in considering whether his guilty plea was knowing and voluntary. See Caramadre, 807 F.3d at 370. So, too, is the length of the period during which plea negotiations persisted. See United States v. Pagan-Ortega, 372 F.3d 22, 29 (1st Cir. 2004).

- 31 -

We add, moreover, that the defendant has proffered no meaningful claim of actual innocence. Although he made a vague assertion of innocence at the hearing on his plea-withdrawal motion, the district court gave that assertion "no credibility whatsoever." Credibility determinations are normally grist for the factfinder's mill, see Caramadre, 807 F.3d at 372, and we see no abuse of discretion in the district court's determination that the defendant's stroke-of-midnight claim of innocence was not credible. After all, a district court is not obliged "to give weight to a self-serving, unsupported claim of innocence." United States v. Ramos, 810 F.2d 308, 313 (1st Cir. 1987). This is especially true when — as in this case — such a belated claim of innocence "flies in the face of several admissions to the contrary." United States v. Santiago Miranda, 654 F.3d 130, 139 (1st Cir. 2011) (quoting United States v. Isom, 580 F.3d 43, 53 (1st Cir. 2009)).

Refined to its essence, this case strikes a familiar note. The defendant "affirmatively declared under oath at a properly conducted Rule 11 hearing that he was guilty of the crimes with which he was charged." United States v. Flete-Garcia, 925 F.3d 17, 25 (1st Cir.) (quoting United States v. Dunfee, 821 F.3d 120, 128 (1st Cir. 2016) (per curiam)), cert. denied, 140 S. Ct. 388 (2019). He has failed to offer any persuasive reason as to why we should permit him to walk away from those solemn

- 32 -

declarations.  Consequently, the district court was free to give decisive weight to the statements made by the defendant at the change-of-plea colloquy.  See id.

To say more would be pointless.  "This court has not allowed defendants, absent coercion or mistake, to renege on plea agreements on the basis that they have miscalculated their risks and benefits or have belatedly discovered a new defense."  United States v. Muriel, 111 F.3d 975, 981 (1st Cir. 1997).  Buyer's remorse is not enough.  Hewing to that line, we conclude that the district court did not abuse its discretion in determining that the defendant failed to establish a fair and just reason for withdrawing his conditional guilty plea.

## III. CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**Affirmed.**